PJR/tab          Code No. 141          File No. 5574-24804

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LISA SCANDORA, | ) | |
|         Plaintiff, | ) | |
| | ) | |
| vs. | ) | 05 C 1206 |
| | ) | |
| VILLAGE OF MELROSE PARK, and | ) | Judge Kendall |
| VITO R. SCAVO, Individually, | ) | |
|         Defendants. | ) | |

**DEFENDANTS VILLAGE OF MELROSE PARK and VITO SCAVO'S RULE 56.1(a) STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT DIRECTED TO COUNT I and II OF THE AMENDED COMPLAINT**

NOW COME the Defendants, THE VILLAGE OF MELROSE PARK and VITO R. SCAVO, by their attorneys, DOWD & DOWD, LTD., and pursuant to FRCP 56.1(a), submit their statement of uncontested facts:

1. The Village hired Lisa Scandora to work as part-time police officer during the summer of 2002 and she worked in that capacity until she was hired full-time in February of 2003 (See pp.35-36 of Scandora's dep test).

2. During the period in which she worked part-time, Scandora thought her work environment was "good" (See pp.37-38 of Scandora's dep test).

3. Scandora first met Chief Scavo during the summer of 2002, shortly after she applied for the part-time position (See pp.38-39 of Scandora's dep test).

4. In October of 2002, Plaintiff decided to apply for full-time employment with the Village and toward that end, sat for the pre-employment examination given in October of 2002 (See pp.42-43 of Scandora's dep test).

5. Scandora admits that while she worked as a part-time officer, none of her supervisors, including Chief Scavo, made her feel unwelcome or unwanted (See pp.44-45 of Scandora's dep test).

6. After she completed her field training Scandora was assigned to the midnight shift (See pp.115-116 of Scandora's dep test).

7. Typically, Scandora would arrive at 11:30 p.m. and roll call would be convened shortly thereafter (See p.116 of Scandora's dep test).

8. Between March of 2003 and December of 2003, Sergeants Sarni and DiMaio and Lieutenant Potomianos served as Scandora's shift supervisor (See p.116 of Scandora's dep test).

9. Sergeant DiMaio never said anything offensive or sexist during roll call meetings (See p.115 of Scandora's dep test).

10. Although Scandora claims that DiMaio made sexist and offensive comments, she claims that she did not ask Chief Scavo to change her shift from midnights to days until either late August 2003 or early September of 2003 (See pp.118-119 of Scandora's dep test).

11. During this alleged conversation with Chief Scavo (pertaining to shift transfer), Scandora did not tell Chief Scavo that DiMaio was subjecting her to sexist behavior or sexist comments (See pp.119-120 of Scandora's dep test).

12. Although she had been working on and off with Sergeant DiMaio for nearly 5 months, the alleged meeting that Scandora claims took place in August of 2003 was the first occasion in which she discussed a shift change with Chief Scavo (See pp.120-121 of Scandora's dep test).

13. On March 19 2003, Sergeant DiMaio wrote Scandora up for failing to respond to his request for back up (See pp.130-135 of Scandora's dep test and Exhibit A attached hereto)

14. Scandora also admits that she had not complained to anyone at the Village about Sergeant DiMaio prior to the March 22 2003 write-up (See p.140 of Scandora's dep test).

15. Scandora acknowledges that she was not written up or disciplined during the period of March 23 through December 1, 2003 (See p.167 of Scandora's dep test).

16. In September of 2003, Scandora advised Chief Scavo that because she was assigned to the midnight shift, she was having difficulty sleeping (See p.215 of Scavo's dep test).

17. On September 4, 2003, Chief Vito Scavo advised Scandora in writing that effective January 8, 2004 she would be reassigned from the midnight to the morning shift (See Exhibit B attached hereto).

18. On November 16, 2003, Plaintiff was injured in an on-duty motor vehicle accident (See p.154 of Scandora's dep test).

19. In late November of 2003, Scandora approached employee Angela Williams and asked her for a copy of a 911 audiotape that was generated in connection with Scandora's November 16, 2003 accident (See pp.16-17 of Arellano's dep test and pp.119-120 of DiMaio's dep test).

20. Williams left civilian employee Celia Arellano a note stating that Officer Scandora would like a copy of the 911 audiotape (See p.16-18 of Arellano's dep test).

21. General Order 02-002-0011 provides that no police personnel are authorized to have copies of files and/or tapes without obtaining the permission of the chief (See pp.170-171 of Scavo's dep test; p.121 of DiMaio's dep test, and Exhibit C attached hereto).

22. Ms. Arellano informed Chief Scavo of Scandora's request for the tape (See p.18-19 of Arellano's dep test).

23. Shortly thereafter, Scandora approached Arellano and asked her "do you have the tape?" and Arellano responded by saying that she "forwarded the request to the chief" and "everything goes through him" (See pp.16-17 of Arellano's dep test).

24. Ms. Arellano told Sergeant DiMaio that Officer Scandora was looking for audiotapes concerning her accident (See p.119 of DiMaio's dep test).

25. Sergeant DiMaio contacted Scandora and advised her that she was not allowed to request audiotapes from civilian personnel and that any such request must be made directly to the chief (See pp.120-121 of DiMaio's dep test).

26. Sergeant DiMaio presented Scandora with a written reprimand which she refused to sign (See Exhibit D attached hereto and p.124 of DiMaio's dep test.

27. Scandora told Sergeant DiMaio that she had not spoken to Arellano about the 911 audiotape (See p.138 of DiMaio's dep test).

28. Following this conversation, Sergeant DiMaio conducted a follow-up investigation and learned that Scandora had in fact spoken to Ms. Arellano and that Scandora had initially requested the tapes from Clerk Williams, who is not even a supervisor (See Exhibit E attached hereto).

29. Scandora specifically asked Ms. Arellano if she had the tapes and Arellano referred Scandora to the chief (See pp.16-17 of Arellano's dep test).

30. Sergeant DiMaio generated a follow-up memorandum dated December 3, 2003 (See Exhibit E attached hereto).

31. In the December 3rd write-up, Sergeant DiMaio stated that Officer Scandora approached Office Rinella and asked for photographs taken in connection with the accident (See Exhibit E).

32. In his December 3rd memo, Sergeant DiMaio advised Scandora that by asking Officer Rinella for copies of the photos, she had once again violated general order 02-002-0011 (See Exhibit E).

33. On December 9, 2003 Sergeant DiMaio learned that Officer Scandora had asked desk officer Corter to stay with her in the booking area while she booked a male prisoner (See pp.23-24 of Christopher Corter's dep test and Exhibit F attached hereto).

34. On or about December 9, 2003, Chief Scavo spoke with Mr. Corter concerning the write-up and learned that Officer Scandora had asked Corter to come into the lock-up and assist her while she booked a prisoner (See p.30 of Corter's dep test and Exhibit F).

35. On December 22 2003, Chief Vito Scavo advised Scandora that she had been terminated for repeatedly ignoring the chain of command (See Exhibit F attached hereto).

36. Scandora admits that she has no evidence or information which indicates that Chief Scavo fired her because she complained about Sergeant DiMaio (See p.141 of Scandora's dep test).

37. Scandora also admits that she never asked Chief Scavo, Lieutenant Caliendo, Lieutenant Sansone or Sergeant DiMaio if she could review the contents of the accident file that was generated in connection with her November 16th traffic mishap (See p.182 of Scandora's dep test).

38. Scandora did not object to returning to work on a light duty basis and never advised Chief Scavo that she was incapable of working on a light duty basis (See pp.157-158 of Scandora's dep test).

39. Scandora did not respond to Plaintiff's second requests to admit facts, including paragraph 12 which describes general order 02-002-0011 and states that no police personnel are authorized to have any copies of files or tapes without permission of the chief (See Exhibit Hattached hereto).

40. On December 1, 2003, Lisa Scandora asked civilian employee Arellano for a copy of the investigation file and/or audio/videotape pertaining to a motor vehicle accident she was involved in November of 2003 (See paragraph 15 of Defendant's Second Request to Admit Facts, Exhibit H.

41. On or about December 1, 2003, Lisa Scandora approached civilian employee Williams and asked her to provide a copy of audiotapes pertaining to her

November 2003 motor vehicle accident (See paragraph 16 of Defendant's Second Request to Admit Facts attached hereto as Exhibit H.

42. On or about December 1, 2003, Plaintiff approached Officer Rinella and asked him for copies of photos taken of the vehicles involved in her November 2003 motor vehicle accident (See paragraph 18 of Defendant's Second Request to Admit Facts, Exhibit H.

43. Lisa Scandora never complained to Vito Scavo about alleged sexual harassment and/or gender discrimination allegedly perpetrated by Dino DiMaio (See paragraph 1 of Defendants' Fourth Request to Admit Facts attached hereto as Exhibit I.

44. Scandora is unable to identify any probationary officers who requested tapes from a civilian employee and was not disciplined (See p.51 of the July 14, 2006 transcript of Lisa Scandora's dep test).

45. Scandora never asked anyone at the department what types of materials or documents were covered by general order 02-002-0011 (See p.53 of July 14, 2006 transcript of Scandora's dep test).

46. Scandora cannot identify any evidence, documents or information which show that Chief Scavo did not honestly believe that she violated general order 02-002-0011 (See p.53 of Scandora's July 14, 2006 dep test).

47. Scandora is unaware of any male probationary officer who asked Officer Corter to assist him in booking a prisoner (See p.54 of Scandora's July 14, 2006 dep test).

48. Scandora is unable to identify any evidence, documents, information or other materials which show that Chief Scavo did not honestly believe that she had asked Mr. Corter to assist her in booking a prisoner (See p.54 of Scandora's July 14, 2006 dep test).

49. Scandora has no knowledge as to whether Officer Phil Negron ever asked a civilian employee to provide him with an audiotape (See p.90 of Scandora's July 14, 2006 dep test).

50. Scandora has no information or knowledge which indicates Phil Negron asked Officer Rinella to provide him with a copy of an accident investigation report (See p.90 of Scandora's July 14, 2006 dep test).

51. Scandora has no knowledge of any male officers who were accused of violating the chain of command and were not disciplined (See pp.85-86 of Scandora's July 14, 2006 dep test).

52. Scandora is not aware of any male officers who complained about sexual harassment and were not terminated (See p.82 of Scandora's July 14, 2006 dep test).

53. Scandora is not aware of anything that prevented her from walking into the chief's office and asking him for the opportunity to review the audiotapes generated in connection with her motor vehicle accident (See p.74 of Scandora's July 14, 2006 dep test).

54. Scandora is unable to identify any male probationary officers who requested tapes from a civilian employee and were not disciplined (See p.51 of Scandora's July 14, 2006 dep test).

55. Although Scandora identified Mark Rieger as a Village officer whom she views as similarly situated and received more favorable treatment, she admits that she does not know when he was injured, the nature of his alleged injury and whether or not he was required to work on a light duty basis after his injury (See pp.161-162 of Scandora's dep test).

56. Scandora also concedes that she does not have any information which indicates that Officer Rieger was in fact treated differently from her in connection with his alleged work-related accident/injury (See pp.161-162 of Scandora's dep test).

57. Scandora can identify no information or evidence which indicates or suggests that male officers who suffered work-related injuries were treated more favorably than she was (See p.164 of Scandora's dep test).

58. Scandora acknowledges that she was a probationary officer and could be fired for almost any reason so long as the reason in question did not violate state or federal law.

59. Chief Scavo also spoke with Officer Rinella concerning Scandora's request for documents generated in connection with the accident investigation (See pp.102-103 of Scavo's dep test).

60. Additionally, civilian employee Kristie Caputo advised him that Scandora requested the opportunity to review the 911 tapes (See pp.103-104 of Scavo's dep test).

61. Chief Scavo advised Sergeants Sarni and DiMaio to tell Scandora that she cannot ask civilian employees, including Celia Arellano and Kristie Caputo, to provide her with documents and tapes (See p.105 of Scavo's dep test).

62. Chief Scavo did not direct the plaintiff to return to work on a light duty basis. Rather, Scandora herself approached him and requested the opportunity to work on a light duty basis (See pp.90-91 of Scavo's dep test).

63. Scandora admits that honesty in police work is very important (See pp.18-20 of Scandora's dep test).

64. She also concedes that the chain of command is an important part of any police organization (See p.20 of Scandora's dep test).

65. Chief Scavo had serious concerns about Scandora's truthfulness and decided to terminate her because of those concerns (See pp.230-232 and 303-304 of Scavo's dep test).

66. He came to this decision after he interviewed a number of employees, including Officer Rinella, Celia Arellano, Chris Corter and Sergeant DiMaio (See pp.89-107 and 185-187 of Scavo's dep test).

67. Chief Scavo did not hire Scandora (See pp.6-7 & 19 of Scavo's dep test).

68. Scandora does not know whether Chief Scavo wanted her off of the force (See p.166 of Scadora's dep test).

DOWD & DOWD, LTD.

By: /s/ Patrick J. Ruberry_____
Attorney for Defendants,
VILLAGE OF MELROSE PARK
And VITO R. SCAVO

## **CERTIFICATE OF SERVICE**

I, an attorney, state Defendants' Rule 56.1(a) statement of uncontested facts was

served electronically to all law firms of record via ECF on March 16, 2007.




                          By:    /s/ Patrick J. Ruberry _____
                                  Attorney for Defendants

Patrick J. Ruberry
Dowd & Dowd, Ltd.
617 W. Fulton Street
Chicago, IL  60661
Tx:  312/704-4400
Fx:  312/704-4500