IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LISA SCANDORA, ) | |
|     Plaintiff ) | |
| ) | 05 C 1206 |
| Vs. ) | |
| ) | Honorable Virginia Kendall |
| VILLAGE OF MELROSE PARK, ) | |
| And VITO SCAVO ) | |
|     Defendants ) | |
| ) | |

MEMORANDUM IN OPPOSITION TO MOTION OF DEFENDANT VILLAGE OF MELROSE PARK FOR SUMMARY JUDGMENT

Plaintiff Lisa Scandora, through her attorney SUSAN P.MALONE, in response to the Village's motion for summary judgment states as follows

Introduction

   Defendant's motion reflects a fundamental misunderstanding of the elements of a Title VII and 1983 claim or the role of summary judgment. Count I of the Complaint alleges defendant Village discriminated against her based upon sex or retaliation for complaining of discrimination by terminating her. Count II alleged the actions of the defendant Village and Scavo were sex discrimination in violation of the equal protection clause, actionable under Section 1983.

  To clear up an apparent misunderstanding on the part of the Village, Scandora has not and is not claiming sexual harassment during her employ at the Village by DiMaio. Rather this is the old fashioned form of sex discrimination where a supervisor and decisionmaker take action against a female where they would not against a male

1

probationary officer, or alternatively take the action because she dared to stand up, even informally, to complain of sexism affecting her employment.

Whether the claim is presented under Title VII or Section 1983, the inquiry and elements are the same. McPhaul vs. Board of Commissioners, 226 F.3d 558, 556 n. 7 (7th Cir. 2000) See also Williams. vs. Seniff, 342 F.3d 774, 788, n. 13 (7th Cir. 2003)(same standards for intentional discrimination apply to Title VII and Section 1983 equal protection claims). [1]

Summary Judgment Standard

As the Seventh Circuit has reminded us, the question on summary judgment is not what will or will not be "proven" at trial. Humphries vs. CBOC West., Inc 474 F.3d 387, 404 (7th Cir. 2006)(recall a plaintiff need not *prove* anything at this stage)(emphasis in original). Whether because of conflicts between plaintiffs testimony and defendants, Paz vs. Wauconda Healthcare, 464 F.3d 659, 644-666 (7th Cir. 2005) or because of inconsistent statements or actions by the defendant, Rudin vs. Lincoln Land Community College, 420 F.3d 712 (7th Cir. 2005), if there is evidence which, if credited, would support a finding of discrimination, the case must proceed to the jury.

I. UNDER EITHER THE DIRECT METHOD OR TRADITIONAL APPROACH, THERE IS EVIDENCE WHICH, IF CREDITED BY THE JURY, WOULD SUPPORT A VERDICT FOR PLAINTIFF ON BOTH COUNTS.

A. Direct method

In reviewing the evidence in this matter, we must recall what the jury in this case will be

---

[1] 1 There is one difference not mentioned by the Village. In Grossbaum vs. Indianapolis, 100 F.3d 1287 (7th Cir. 1996), the court stated that a retaliation claim for alleged protected first amendment speech does not give rise to an independent equal protection claim under Section 1983. Where that is or is not current law is questionable considering Humphries vs. CBOCS West, Inc. 474 F.3d 387 (7th Cir. 2006) recognizing that

2

asked to decide. For both claims, the jury will be asked to decide whether it is more probably true than not that plaintiffs sex or her complaints of discrimination were a motivating factor in her termination. Seventh Circuit Pattern Jury Instructions 3.01 (2004). In making this determination, the jury will be instructed that both direct and circumstantial evidence ought be considered and the decision what weight to give any piece of evidence is theirs to make. Id. 1.12 (2004). This is consistent with the Supreme Court's decision in Desert Palace vs. Costa, 539 U.S. 90, 123 S.Ct. 2148 (2003) in which the Court reminded us that jury verdicts are returned every day relying only upon circumstantial evidence. As Judge Posner pointed out, most evidence could be considered circumstantial as juries are asked to infer one fact from the existence of others. Sylvester vs. SOS Children's Village, 453 F.3d 900 (7th Cir. 2006).

The Seventh Circuit has instructed that the direct method encompasses both direct and circumstantial evidence of all varieties, including conflicts between the testimony of one witness and another, inconsistent explanations for actions, the timing of events, behaviour towards others in the same group and all of the other bits and pieces which make up the case. Rudin vs. Lincoln Land Community College, 420 F.3d 712, 719-21; Paz v. Wauconda Healthcare, 464 F.3d 659, 664-666 (7th Cir. 2006), Sylvester vs. SOS Children's Village Inc., 453 F.3d 900(7th Cir. 2005).

As to the claim of retaliation for her complaints of discrimination, if a plaintiff shows that after complaining of discrimination, she and only she was subject to an adverse employment action and this is uncontroverted, plaintiff is entitled to summary judgment. If this evidence is controverted, plaintiff may establish a prima facie case of retaliation

---

retaliation for protesting discrimination has long been seen as merely another variant of illegal discrimination. Under Section 1981 and 1982.

utilizing her claim through the direct or indirect method. Stone vs. City of Indianapolis 281 F.3d 640, 644; Phelan vs Cook County, 463 F.3d 773 (7th Cir. 2006); Sylvester vs. SOS Children's Village IL Inc., 453 F.3d 900 (7th Cir. 2006).

As to the defendants' reliance upon requests for admission, as stated in the response, there were two requests, both of which were answered. (RDSA, par. 39, 40, 43) The fourth request was not received and there is no record of any discussion concerning this alleged request after the date it was allegedly forwarded. The content of that request moreover directly contradicts the deposition testimony in this case and was objectionable in form and substance.

In the present case, it is undisputed that except for Sergeant DiMaio, no one questioned Scandora's performance of her duties. (PSA, 3). Scavo himself admitted that he had no quarrel with her work as a police officer. (PSA 3, Ex. B, Scavo dep. Pg 62-3, 125-6)

Defendants have offered varying statements as to why plaintiff was terminated. First, they contend she was terminated for "repeated violations of GO 02-002-0011". (RDSA # 21.).[2] On its face, the general order precludes having copies of files or tapes and it is undisputed Scandora never had those. It is also undisputed that there is nothing wrong with asking questions about the process which is all Scandora did (Pl.Sta. par 10, Ex. A, Ex B, Scavo Dep 160-1, Ex. D, Sarni dep. 56, Ex. E, Potamianos dep. 22-3) and the Chief stated he would have given her access had she asked. (RDSA, 21, Ex. B, Scavo dep. 100). Indeed, Defendants suggest there was nothing precluding Scandora from leapfrogging completely the chain of command and going directly to Scavo. (DSA 53, RDSA, 53).

---

[2] Plaintiff will refer to her statement of additional fact as PSA par ___ while the defense statement is referenced DSA par___ and her response to those statements as RDSA, par ____.

4

At the time of termination, Scavo's stated reason was different, i.e. "disrespect, insubordination' and repeated violations of the chain of command. (RDSA 35). Yet, Scavo himself states that the chain of command had nothing to do with plaintiff inquiries of fellow officers and employees. (PSA 10, Ex. B, 160-1) and all of her alleged inquiries actions predated the December 1, 2003 "writeup" which DiMaio himself characterizes as a "reprimand" or "warning". (RDSA 19, 20). Defendants now contend that it was not those inquiries but alleged dishonesty when questioned that led to her demise. There are several reasons why a jury would be permitted to find this lacks credibility. First of course, defendants did not raise this at the time. Second, there is conflicting testimony as to whether the alleged meeting occurred, or who was present. (PSA, 21, RDSA 34 ). Third, all of plaintiff's supervisors, other than DiMaio, agree her performance as a police officer was fine. (PSA 3).

In the present case, there is circumstantial evidence which, if credited, would support a plaintiffs' verdict. First, of course, there is a dispute as to whether DiMaio did or did not make the statement attributed to him and another whether Scandora did or did not tell Scavo DiMaio was making such statements attributed to him by Scandora. (PSA par.2). DiMaio was not supposed to be acting as a shift or patrol supervisors between March and August, 2003 because of some unknown anger management problem which arose on a call – yet, he continued to act in this capacity but did not participate in Scandora's performance reviews – some of which appear to be missing. (RDSA, 8).

Second, there is disputed testimony as to whether Scandora did or did not violate any order. It is undisputed that Scandora never had possession of nor removed from the department files or tapes. It is recognized that it was commonplace for officers to ask

5

each other and civilian questions concerning policies or procedures. (PSA, 10). It was admitted that no one, other than Scandora, has even been written up, reprimanded, suspended or discipline for asking such questions. (PSA, 25).

As to the alleged violation of chain of command in asking Corter whether he knew how to fix the computer jam, there is again ample evidence. First, Scavo himself admits that the chain of command has nothing to do with conversations between officers or civilian employees asking each other questions. (PSA 160-1). Corter was not asked about this incident until at least December 10, 2003. (RDSA 33). He acknowledged this sort of inquiry happens all the time. (Id). DiMaio acknowledges that he did not learn of this alleged incident from Corter or Scandora and believes it may have been Chief Scavo himself who told him about this. (RDSA 33). Scavo claims to have learned of it when he received the December 9, 2003 "writeup" or alternatively cannot recall when he learned of this alleged incident. (RDSA 34).

There has never been any explanation why DiMaio framed the incident as seeking help with a male prisioner when he knew the entire incident involved trying to clear a computer jam. Obviously, it makes the incident sound more dire as if the female officer whom DiMaio decided to place in the lockup while on crutches and a knee brace could not do her job.

Scavo denied pressuring Scandora to return to work following her accident, and disputes Scandora's testimony. Scandora's testimony about this issue was supported by her contemporaneous conversations with her doctors and Ms. Saleme the Village clerk. (PSA 7, 8). It is also undisputed at the time there was no limited or light duty program and Scandora's doctor originally directed she remain off work until the surgical repair

6

scheduled for December 29, 2003.

Scavo gave conflicting reasons for terminating Scandora. The Village contended it was for "repeated" violations of the general order precluding possession of materials. Scavo then contended in the termination letter it was "insubordination, disrespect of an immediate supervisor (DiMaio) and repeated violations of the chain of command. Scavo acknowledges that these incident occurred in November, 2003 or were commonplace at the department.

Although Scavo denies it, Scandora testified she met with Scavo twice about the comments DiMaio was making. Lt. Potamianos confirmed that Scandora told him she was being harassed and he advised her she could go to the chief if she wanted to. (Ex. E,Potamianos dep. 36-7 ). Scandora testified Scavo twice made comments about her sex – once when pressuring her to return to work and the second time at the termination meeting and was dismissive when she talked to him about DiMaio. (RDSA 10, 11). As Scandora testified, Scavo knew she hadn't violated the general order as she never had possession of the material and the chain of command has nothing to do with communications at the same rank. (RDSA 46). Scavo made comments about her sex in the meetings with him.

As noted, it is also noteworthy how Scavo treated male probationary officers. A reasonable jury could conclude that it is obviously more important that police officer refrain from using excessive force than from asking questions of their peers. Yet, when another probationary officer was videotaped violating this basic rule, he was merely suspended for five days and assured this was the end of the matter. (Ex. K). When the same officer responded to correction by his supervisors as being a "bad joke", he was

7

warned that this might lead to an extension of probation.

Another officer involved in two car accidents which were his fault, who violated call in and court call procedures, was sent for additional training and had his probationary period extended. (PSA, 26, 27).

The Village acknowledges that as of the date of Scandora's termination, there is no record that any male probationary police officer has ever been written up, reprimanded or disciplined for violation of the chain of command or asking questions of the fellow officers or employees. (PSA 24, 25). [3]

DiMaio admits that sometime after these writeups and before the termination, he and Scavo had a conversation in which they discussed that fact that if Scandora were terminated while still probationary, there would be no opportunity for review. (Ex C, DiMaio dep. Ex. 167-8).

The Village appears to suggest that Scandora's performance reviews after May 2003 together with the documents which detailed why DiMaio had been sent to counseling were confiscated by the FBI in a raid while this matter was pending. The Village has not provided any support for such an outrageous assumption and the fact these documents are missing must be construed against the Village.

All of this is circumstantial evidence the jury would be entitled to consider as indicative of the fact that either Scandora's sex or her complaints about DiMaio were the motivating factor in her dismissal.

      B. Indirect Method

Under the indirect method, as defendants acknowledge, there are four primary factors, i.e. 1) membership in a protected class or engaging in protected activity such as good faith

complaints of discrimination 2) performance meeting the employees legitimate expectations, 3) an adverse employment action and 4) similar employees were treated more favorably, i.e. not fired. <u>Brumett v. Sinclair Board Group Inc</u>. (7th Cir. 2005). In the present case, it is undisputed that plaintiff was one of only two women employed at Melrose and there is a dispute as to whether she did or did not complain of discrimination. It is undisputed that element 3 is satisfied, i.e. she was fired.

Defendant contends she cannot establish elements 2 and 4.

As is often the case, in the present case, the defendant collapses element 2 of the prima facie case and its stated reason contending that Scandora was not meeting its legitimate expectations for the same reasons it contends it terminated her. Where this occurs, the two questions collapse into one, i.e. is there evidence from which a reasonable jury could conclude that the stated reason for the defendants actions were phony or not true. <u>Thanongsinh vs. Board of Education</u>, 462 F.3d 762 (7th Cir. 2006). This is particularly true where the so-called "legitimate expectations" and stated reason are themselves suspicious, or questionable in nature. If there is evidence from which a reasonable jury could conclude the "expectation" were manufactured to justify termination i.e. not bona fide, summary judgment is not proper. <u>Coc vs. Elmwood Care, Inc.</u>, 128 F.3d 1177,1179-80 (7th Cir. 1997); S<u>inio vs. McDonalds Corporation,</u> 2007 WL 869553 (N.D.Ill. March 19, 2007)(Gottschall, J).

The same evidence which supports the direct method case supports the argument that the expectations and the stated pretext were phony or untrue.

Defendant also suggests that plaintiff must "prove" at summary judgment that its stated reason for termination was a coverup for discriminatory animus and a deliberate

---

like Sccandors' peperformance reivws after May and the documents del[3]

9

lie. (Def. Br. Pg 11-14). Keep in mind, plaintiff is not required to prove anything. Rather, all plaintiff is required to point to evidence from which a reasonable jury could conclude that it is more likely than not that plaintiffs sex or, as to Count I, her gender was a motivating factor in her dismissal.

Defendants appear to rely upon <u>Forrester vs. Raulander-Borg Corporation</u>, 453 F.3d 416, 419 (7th Cir 2006) and <u>Farrell v. Butler University,</u> 421 F.2d 609 613 (7th Cir. 2005) without the context of those decisions. Some earlier cases had suggested that if the employer's stated reason was facially insufficient to motivate the decisions, this alone would defeat summary judgment. In <u>Forester</u> and <u>Farrell</u>, the Seventh Circuit reiterated that this was not the meaning of "pretext" which, by definition means a phony reason. Rather the court state the focus must be on whether the reason provided is or not the true reason. In making that decision, the jury will be entitled to consider all of the factors, timing, statements, treatment of other employees, inconsistent statements of the decisionmaker and the manner in which other employees in plaintiffs position were treated. All of these inquiries are relevant and directed to the question of whether the employers stated reason was phony, i.e. a lie. As Judge Posner pointed out, if there is such evidence, it is possible that the employer might still not be guilty – after all, one may lie about a reason to cover another disreputable reason for the action. However, if there is evidence from which a reasonable jury could conclude the employer lied, the matter must go to the jury. <u>Forrester vs. Rauland-Borg Corp</u>., 453 F.3d 416, 417 (7th Cir. 2006) (the case could not be resolved on summary judgment because the trier of fact would be entitled to infer discriminatory motive)

Defendants further contend that plaintiff cannot identify a similarly situated male

10

employee, suggesting this requires a male probationary police officer who, during the same time frame, was accused of violating the chain of command or accussed of having possession of tapes or files. Defendants are wrong.

In <u>Humphries vs. CBOC West, Inc.</u>, 474 F.3d 387 (7th Cir. 2007), Judge Williams reminded us that the "similarly situated" provision was not intended as an inflexible talisman:

> This requirement should not be applied mechanically or inflexibly.. True, we have sometimes stated the similarly situated requirement in the "must" terms Cracker Barrel argues but a more sensitive reading of our cases indicates that we have often stated that the similarly situated requirement *normally* entails a showing that the employees dealt with the same supervisors, were subject to the same standards and had engaged in similar conduct with differentiating or mitigating circumstances as would distinguish their conduct.In other words, we have emphasized that the similarly situated inquiry is a flexible one that considers all relevant factors, the number of which depends on the context of the case…[O]ur case law does not provide 'any magic formula for determining whether someone is similarly situated..the purpose of the…requirement is to eliminate confounding variables, such as differing roles, performance histories or decision-making personnel which help to isolate the critical independent variable: complaints about discrimination..the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would be comparator to allow the type of comparison that, taken with the other prima facie evidence would allow a jury to reach an inference of discrimination or retaliation – recall that the plaintiff need not *prove* anything at this stage.  (Emphasis in original)

Id at 404-5.  Judge Williams further reminded us that the entire purpose of the McDonnell Douglas test from its inception was to provide a "boost" for plaintiffs, not the straightjacket the defendants in this matter suggest.

In <u>Timmons vs. General Motors,</u> 469 F.3d 1122 (7th Cir. 2006), Judge Sykes again reminded us that the fourth element need not be met by showing identically situated employees. Rather, the Court stated, the "fourth prong (and actually the test as a whole) really requires a showing 'that the circumstances surrounding the adverse action indicate that it was more likely than not that his disability was the reason". Id at 1126-7.

11

   Defendants suggestion that the case must fall unless another probationary police officer was written up for violating the "chain or command" or asking about access to photos or files would create a prefect, foolproof pretext. All an employer need to, according to defendants, is fire a woman or minority for something exceedingly minor in the context of a commonplace practice but the exact parameters of which no one else has ever even been accused of, or even disciplined.

   In addressing this question, we must keep in mind that no male officer in Melrose Park has ever been reprimanded, warned, suspended or even criticized for asking questions of their fellows or civilian employees. Plaintiff and only plaintiff was charged with this under the false claim that she had violated an order. Plaintiff and only plaintiff was charged with violating an order directed to possession of tapes or files for asking how one could obtain acesss to those documents.

   We cannot ignore the difference in treatment of the male officers – none of whom were subjected to frivolous and false "writeup".  Mr. Negron had two auto accidents – one of which sent one of his fellow officers to the hospital, and the other of which damaged four civilian vehicles – including that of the Village Clerk. This employee had multiple performance deficiencies documents by many supervisors. Yet, Chief Scavo's response is to gently call him into the office and ask if anything is troubling him in his personal life affecting his performance. (PSA, 26,27). Yet another is videotaped using excessive force and receives a brief suspension and a promise that this is the end of the inquiry. (PSA 28-29) Scandora, on the other hand, is pressured to return to work where she is assigned to the lockup on her own, while on crutches and then subjected to frivolous complaints.

12

Why would Scavo pressure an officer on crutches and with a knee brace to return to duty and then assign the officer to work alone in a lockup? The Department had no limited duty program, and even assuming arguendo it did, it makes little sense to assign an officer who is not completely ambulatory to booking and fingerprinting prisoners. The answer, of course, is that without something on her record – even frivolous things – there was no pretext on which to fire her.

Why would Scavo sign off on reprimands stating that conduct he knew occurred in November occurred between midnight December 1 and December 3? Why would Arellano state she had not spoken to DiMaio if she had? How did DiMaio learn of the non-event involving the computer jam? Was it from Scavo and if so why would Scavo not acknowledge this? If inquiries are commonplace, as acknowledged by Scandora, Sarni, Potamianos and have nothing to do with the Chain of Command, why even reprimand Scandora for this? When no one other than DiMaio considered Scandora in any manner deficient, why terminate her while she is on medical leave for "insubordination" and "disrespect to her immediate supervisors"? If Scandora was insubordinate to her supervisors, why did Sergeant Sarni and Lt. Potamianos report no problems?

One rational explanation relates to the very fact that Scandora did her job well. If Scandora was not terminated before she transferred to another shift, there was no reason to believe she would not complete her probationary term without incident. There were no incidents of any kind when she reported to anyone other than DiMaio. With her return to medical leave, Scandora would have been returning to work under a different supervisor. At a minimum, the timing of the termination, shortly after her complaints and with the

plethora of different explanations raises questions of fact.

The record in this matter is clearly replete with conflicting testimony as to who said what to whom on various occasion. The bottom line in the pretext inquiry is whether there is evidence that the reasons for termination were phony or fishy. As Judge Posner noted, this does not mean that the Village is necessarily guilty, but it does mean that the issue is for the jury.

VI. THE VILLAGE IS NOT ENTTILED TO SUMMARY JUDGMENT ON THE QUESTION OF MUNICIPAL LIABILITY.

As the defendant acknowledges, the Village can be held responsible under Section 1983 if the constitutional injury was caused or ratified by a person with final policymaking authority. Simmons vs. Chicago Board of Education, 289 F.3d 488, 491 (7th Cir. 2002). Where probationary police officers in Melrose Park are concerned, Defendant Scavo is and was by law and custom the final, policymaking authority. Scavo stated he and he alone makes these decisions, without consulting anyone. He and DiMaio discussed the fact that if he terminated Scandora during her probationary term, he would not have to answer to anyone else and the Mayor told the Village Clerk that Vito could do as he wished in his department. (PSA par 23). For all practical purposes, in Melrose Park, Chief Scavo was the end of the line for decisions and policy. Because he knew this, and because he knew that if he fired Scandora, no village authority could or would question or review his actions, he is the final policymaker for the Village in this context.

It is virtually impossible to sandwich all of the testimony and materials which will be presented at trial into 120 statements and responses. It is for this reason that summary

14

judgment is frequently inappropriate in employment actions. Yet, in virtually every employment discrimination actions a summary judgment motion will be filed. As in the present case, where there is evidence which, if credited by a jury, would support a verdict for plaintiff those motions should and must be denied.

Conclusion

   For the reasons stated herein, plaintiff Lisa Scandora respectfully requests this Honorable court to deny the motion of the defendant Village for summary judgment in this matter.

                      Respectfully submitted

                      _____

Susan P. Malone
20 N Clark St
Suite 1725
(312) 726-2638
smalonelaw@sbcglobal.net