# Exhibit B

## Scavo Deposition Excerpts & Exhibits

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF ILLINOIS
 3               EASTERN DIVISION
 4
 5    LISA SCANDORA,              )
 6             Plaintiff,         )
 7        vs.                     )   No. 05 C 1206
 8    VILLAGE OF MELROSE PARK,    )
 9    and VITO R. SCAVO,          )
10    Individually,              )
11             Defendant.         )
12
13
14             The videotaped deposition of CHIEF VITO
15    R. SCAVO, called for examination, taken pursuant
16    to the Federal Rules of Civil Procedure of the
17    United States District Courts pertaining to the
18    taking of depositions, taken before ANNETTE M.
19    MONTALVO, a Notary Public within and for the
20    County of Lake, State of Illinois, and a
21    Certified Shorthand Reporter of said state, at
22    Suite 1745, 20 North Wacker Drive, Chicago,
23    Illinois, on the 19th day of June, A.D. 2006, at
24    10:00 a.m.
```

2

```
 1   PRESENT:

 2

 3        SUSAN P. MALONE,

 4        (20 North Wacker Drive, Suite 1745,

 5        Chicago, Illinois  60606,

 6        312-726-2638),

 7             appeared on behalf of the Plaintiff;

 8

 9        DOWD & DOWD, LTD.,

10        (617 West Fulton Street,

11        Chicago, Illinois  60661,

12        312-704-4400), by:

13        MR. PATRICK J. RUBERRY,

14             appeared on behalf of the Defendant.

15

16

17

18   ALSO PRESENT:

19        MS. ANGELA MOBLEY, Videographer,

20             Esquire Deposition Services.

21

22

23   REPORTED BY:  ANNETTE M. MONTALVO, CSR, RMR,

24             CSR CERTIFICATE NO. 84-3967.
```

4

1      MR. RUBERRY:  Patrick J. Ruberry appearing on

2  behalf of the defendants.

3      THE VIDEOGRAPHER:  Will the reporter now

4  swear in the witness, please.

5                (WHEREUPON, the witness was duly

6                sworn.)

7                CHIEF VITO R. SCAVO,

8  called as a witness herein, having been first

9  duly sworn, was examined and testified as

10 follows:

11                EXAMINATION

12 BY MS. MALONE:

13     Q.    All right.  Chief Scavo, can you please

14 state your full name and spell your last name for

15 the record.

16     A.    Vito R. Scavo, S-c-a-v-o.

17     Q.    And you are the chief of police of

18 Melrose Park, Illinois?

19     A.    Yes.

20     Q.    Chief, I assume during the course of

21 your police career you have had your deposition

22 taken before?

23     A.    Yes.

24     Q.    Just so our record is clear, I would

8

1    Q.    Okay.  If a police officer, an employee

2    violates a rule or regulation or procedure, what

3    is the process and procedure by which that

4    officer will be corrected or disciplined?

5        MR. RUBERRY:  Objection.  Vague.  Relevance.

6    Calls for speculation.  Foundation.  Go ahead and

7    answer.

8    BY THE WITNESS:

9    A.    If there's a discipline problem, I am

10   notified by the their immediate supervisor, which

11   would be either a lieutenant or sergeant at that

12   point in time of the discipline problem, either

13   in writing or verbally we discuss it or I read

14   it.  And, normally, an individual's called in,

15   and it is discussed.  And if we feel or I feel as

16   though it needs to be carried out to a further

17   point, I do.  If not, it is discussed.  If there

18   is not a letter written, I will tell the shift

19   commander or her immediate or his immediate

20   supervisor to put it in writing.  The individual

21   who is in question will sign that disciplinary

22   letter, and it will be put in their personnel

23   file forever.

24   Q.    So there may be a write up of the

9

1    officer, there may be a reprimand, they might be

2    suspended?

3       MR. RUBERRY:  Objection to the form of the

4    question.

5          Go ahead and answer.

6    BY THE WITNESS:

7       A.    There could be a suspension, it could

8    be nothing, it could be whatever.  There's

9    several ways to go with it.

10   BY MS. MALONE:

11      Q.    And how do you decide whether you are

12   going to reprimand an officer or suspend them?

13      MR. RUBERRY:  Object to the form of the

14   question.  Incomplete hypothetical.  Vague.

15   Foundation.  Go ahead and answer.

16   BY THE WITNESS:

17      A.    How do I -- I'm sorry, could you repeat

18   that?

19   BY MS. MALONE:

20      Q.    Right.

21          Once a supervisor brings a matter to

22   your attention, how do you decide whether the

23   particular action is worthy of a reprimand or is

24   worthy of a suspension or something else?

1    MR. RUBERRY:  Same objection.  Go ahead and

2    answer.

3        THE WITNESS:  Sorry.

4        MR. RUBERRY:  Go ahead and answer.

5    BY THE WITNESS:

6        A.    It is based on my own opinion, one; on

7    the opinion of the supervisor, two; if the

8    individual officer has any retort, or

9    explanation, three; if it is repetitive, four.

10   There's, you know, there's quite a bit of things

11   that I take into consideration.

12   BY MS. MALONE:

13       Q.    Now, you also indicated that if an

14   officer is disciplined, there will be a write up

15   that will be in their personnel file for the

16   duration of their employment?

17       A.    Correct.

18       Q.    Does Melrose Park also employ part-time

19   officers?

20       A.    Yes.

21       Q.    And the same procedure that you

22   mentioned would refer to -- also be applicable to

23   apply to part-time officers?

24       A.    No.

12

1    A.    And lieutenants, also.

2    Q.    Okay.  So I take it the chain of

3  command would be patrol, sergeant, deputy chief,

4  yourself?

5    A.    Correct.

6    Q.    And, normally, then, if a sergeant has

7  an issue, they ought bring it to the lieutenant,

8  who brings it the deputy, who brings it to you?

9    A.    Correct.

10    Q.    Of the full-time officers currently

11  employed by the Village of Melrose Park, how many

12  are women?

13    MR. RUBERRY:  Objection.  Relevance.  Go

14  ahead and answer.

15  BY THE WITNESS:

16    A.    At this time, police officers?

17  BY MS. MALONE:

18    Q.    Right.

19    A.    One.

20    Q.    And in 2004, how many women were

21  employed by Melrose?

22    A.    You know, I don't recall.  I can't be

23  honest.

24    MR. RUBERRY:  Well, you can be honest, you

1      A.    No.

2      Q.    Ms. Young did not pass the test,

3   though, to the best of your recollection?

4      MR. RUBERRY:  Objection.  I don't think you

5   have asked him what his recollection is with

6   respect to that.  Also, it is irrelevant.

7            Go ahead and answer.

8   BY THE WITNESS:

9      A.    I can't recall.

10  BY MS. MALONE:

11     Q.    Do you recall an officer by the name of

12  Jennifer Lester?

13     A.    Yes.

14     Q.    Ms. Lester was hired by Melrose Park as

15  a police officer?

16     A.    Yes.

17     Q.    Was Ms. Lester terminated?

18     A.    She resigned.

19     Q.    And how did it come about that Officer

20  Lester resigned her position?

21     MR. RUBERRY:  Objection.  Relevance.

22            Go ahead and answer.

23  BY THE WITNESS:

24     A.    You would have to ask her.  I have --

16

```
 1   you know, that's her decision.
 2   BY MS. MALONE:
 3       Q.    Did Ms. Lester file any complaint or
 4   action against the Village of Melrose Park to
 5   your knowledge?
 6       A.    Not to my knowledge.
 7       Q.    And it is your best recollection that
 8   her termination was entirely voluntarily?
 9       MR. RUBERRY:  Objection.  Form of the
10   question.  Testimony was resignation, not
11   termination.  Two different.
12   BY MS. MALONE:
13       Q.    I'm sorry, was --
14       MR. RUBERRY:  Do you understand the question?
15       THE WITNESS:  Yes.
16       MR. RUBERRY:  Okay.  Go ahead and answer.
17   BY THE WITNESS:
18       A.    That would be you would have to ask
19   her.  She resigned.  She resigned.  That's all --
20   you know, know at this time.
21   BY MS. MALONE:
22       Q.    Do you recall whether Ms. Lester was
23   disciplined or reprimanded in any way by --
24       A.    She was disciplined and reprimanded.
```

17

```
 1      Q.    And what was the nature of the
 2  discipline imposed upon Ms. Lester?
 3      A.    There were several.  I can't recall
 4  every one of them.
 5      Q.    Did you suspend or discipline
 6  Ms. Lester?
 7      A.    I would have to check the personnel
 8  file.  It is very possible I suspended or
 9  disciplined her in some fashion.
10      Q.    Is Ms. Lester's personnel file at the
11  Village, to your knowledge?
12      A.    Yes.
13      Q.    Do you recall any women other than
14  Lisa --
15      MR. RUBERRY:  For the record, I think he
16  means a copy.
17      MS. MALONE:  Pardon?
18      MR. RUBERRY:  A copy of the file.
19      THE WITNESS:  Yes.
20      MR. RUBERRY:  The FBI has the original.
21      THE WITNESS:  Right.
22      MR. RUBERRY:  Just so we are all on the same
23  page.
24  BY MS. MALONE:
```

22

1    Relevance.

2    BY MS. MALONE:

3        Q.    Did you compare the number of women and

4    minorities taking the Melrose test to that of

5    other municipalities in the area?

6        MR. RUBERRY:   Same objection.  Relevance.

7    BY THE WITNESS:

8        A.    No.

9    BY MS. MALONE:

10       Q.    Other than the ladies we have mentioned

11   before, can you recall any other women who were

12   hired by Melrose Park Police Department during

13   your tenure as police officers?

14       A.    No.

15       Q.    And that would be since 1995?

16       A.    Correct.

17       Q.    Would that include part-time personnel

18   as well?

19       MR. RUBERRY:   Objection.  Vague.

20              Do you understand the question?

21       THE WITNESS:   I understand the question.

22   BY THE WITNESS:

23       A.    I can't recall because the part-time

24   seem to have a turnover.

1   police officer stopping by and saying --

2   mentioning something of this kind to you?

3      MR. RUBERRY:  Objection.  Form.

4   Argumentative.  Vague.

5         Go ahead and answer.

6   BY THE WITNESS:

7    A.   No.

8   BY MS. MALONE:

9    Q.   Now, you mentioned that Officer

10  Scandora was already -- had already taken the

11  police training course?

12    A.   Yes.

13    Q.   Does that mean then that she did not

14  have to repeat the police academy upon her

15  employment with Melrose Park?

16    A.   She did not have to repeat, correct.

17    Q.   How long a probationary term do police

18  officers of Melrose Park serve?

19    A.   18 months.

20    Q.   And do you recall that 18-month

21  probationary period, what role, if any, does the

22  Board of Police and Fire Commissioners play in

23  the discipline of police officers?

24    A.   None.

1      Q.     If you choose to suspend or reprimand a

2   probationary police officer, are you -- is it

3   your practice or policy to discuss it beforehand

4   with anyone at the Police and Fire Commission?

5      A.     No.

6      Q.     Same thing with termination.  If you

7   choose to terminate a probationary officer, is it

8   your practice or policy to discuss it with

9   anyone?

10     A.     No.  Excuse me.  Anyone on the Police

11  and Fire?

12     Q.     Police and Fire.

13     A.     No.

14     Q.     Anyone else at the Village, is it your

15  practice or policy to discuss it with anyone at

16  the Village?

17     A.     The Village or the police department?

18  Nobody at the Village, no.

19     Q.     So you wouldn't go talk to the Village

20  personnel department or anyone else?

21     A.     No.

22     Q.     Now, you said at police -- you might

23  talk it over with someone in the police

24  department?

1       A.      Immediate supervisor.

2       Q.      Other than Lisa Scandora, can you

3    recall any other probationary police officers

4    whom you have terminated in the past five years?

5       A.      Yes.

6       Q.      And who would that be?

7       A.      Anthony DeRosa.  I believe the other

8    one is -- I think it is Angelo Echevierra.  You

9    know what, there might be another one that is

10   skipping my --

11      MR. RUBERRY:  Excuse me.

12      THE WITNESS:  God bless you.

13   BY THE WITNESS:

14      A.      There might be one more.  I might have

15   to give it some thought, but I can't recall at

16   this time.

17   BY MS. MALONE:

18      Q.      And when was Mr. DeRosa terminated?

19   Was that before or after Lisa Scandora?

20      A.      After.

21      Q.      And the same thing with Echevierra --

22      A.      I believe Echevierra was after, also.

23      MR. RUBERRY:  Let her finish her question.

24   BY MS. MALONE:

27

1    Q.    Before terminating Lisa Scandora, do

2    you recall any other probationary police officers

3    whom you have ever terminated while you were

4    chief of police?

5    A.    I don't recall at this time.

6    Q.    What was the reason for the termination

7    of Officer DeRosa?

8    A.    Discipline, both.

9    Q.    What was the infraction that he was

10    believed to be guilty of?

11    A.    You know what, I don't recall at this

12    time.  It is several.

13    Q.    So it is several different infractions?

14    A.    Correct.

15    Q.    But you can't recall what any one of

16    those were?

17    A.    No.  Not specifically, no.

18    Q.    Had he been suspended before he was

19    terminated?

20    A.    I would have to check his file.  I'm

21    not certain of that either.

22    Q.    What about Officer Echevierra?

23    A.    What about it?

24    Q.    Do you recall why he was terminated?

28

1    A.    He was terminated due to several

2  reports of disciplinary problems while in the

3  academy.

4    Q.    So he was still in the police academy

5  and you were getting reports from the academy

6  that he was having discipline issues?

7    A.    Yes.

8    Q.    And just so our record is clear, the

9  police academy that you are referencing, which

10  police academy is that?

11    A.    Cook County.

12    Q.    So you were getting reports from the

13  Cook County Police Academy that Officer

14  Echevierra was a discipline problem?

15    A.    Correct.

16    Q.    And these were repeated reports?

17    A.    There was more than one.

18              (WHEREUPON, a certain document was

19              marked Scavo Deposition Exhibit

20              No. 1, for identification, as of

21              6/19/06.)

22  BY MS. MALONE:

23    Q.    Chief Scavo, showing you what we have

24  marked as Deposition Exhibit No. 1, can you

1    identify this document, please.

2         A.    This is a day off schedule.

3         Q.    And this schedule lists a particular

4    shift in the police department?

5         A.    Yes.

6         Q.    This references the police schedule for

7    the -- to be like the third shift with Lieutenant

8    Potamianos as the watch commander or shift

9    supervisor?

10        A.    Yes.

11        Q.    And then there's two sergeants who work

12   on that shift, or did at that time, reporting to

13   Lieutenant Potamianos?

14        A.    Yes.

15        Q.    And that would be Sergeant DiMaio and

16   Sergeant Sarni?

17        A.    Right.  Correct.

18        Q.    And just so we are clear on the chain

19   of command here, Sergeant DiMaio and Sergeant

20   Sarni report to Lieutenant Potamianos?

21        A.    Lieutenant Potamianos' title would be

22   station supervisor, and, yes, due to the rank,

23   they would.

24        Q.    And then Lieutenant Potamianos would

31

1   ought be that Sergeant DiMaio or Sergeant Sarni

2   would bring an issue to the attention of

3   Lieutenant Potamianos?

4       A.    Well, in this particular case, due to

5   the fact that he is the station supervisor, that

6   would be an exception.

7       Q.    So they wouldn't bring it to him or

8   they would?

9       A.    They wouldn't.

10      Q.    They wouldn't?

11      A.    No.

12      Q.    What issues ought they bring to his

13  attention?

14      MR. RUBERRY:   Object to the form of the

15  question.   It is vague.   Go ahead and answer.

16  BY THE WITNESS:

17      A.    None.

18  BY MS. MALONE:

19      Q.    And what -- I'm sorry.   I am unclear.

20            They are reporting to him, but they

21  don't bring any issues to his attention?

22      A.    I can define this, and you will get it

23  clear.

24      Q.    Great.

32

```
 1      A.    He is the station supervisor.  His
 2   responsibility are prisoners, what goes on in the
 3   station, what comes into the station, so on and
 4   so forth.  Those -- Sarni and DiMaio, they are
 5   the street supervisors.  They actually run the
 6   shifts, they run the men, they run the
 7   discipline, the day off schedules, so on and so
 8   on and so on.
 9           So if there was a problem on the
10   street, if there was a discipline problem, or
11   whatever it might be, concerning the men
12   themselves, under their command, they would not
13   go to Potamianos.  They would go either to Deputy
14   Chief Manteno, who is a patrol deputy chief, or
15   directly to me.
16      Q.    So if there was a problem concerning
17   something that transpired in the station,
18   Lieutenant Potamianos would be involved?
19      A.    Correct.
20      Q.    And if that problem in the station
21   concerned prisoners and police officers, would
22   Lieutenant Potamianos be involved?
23      MR. RUBERRY:  Objection.  Vague.  Compound.
24           Go ahead and answer.
```

38

1    move or whatever.

2        Q.    But upon completion of their

3    probationary period, they are required to be

4    residents of Melrose Park?

5        A.    Correct.

6        Q.    For how long a period of time has

7    Mr. -- as I will refer to him for purpose of our

8    record, Mr. DiMaio been employed by the Village

9    of Melrose Park?

10       A.    Guessing, anywhere between 18 to 22

11   years.

12       Q.    And was there a time period during

13   which Mister, or then Sergeant, DiMaio served as

14   a station supervisor?

15       A.    No.

16       MS. MALONE:  Mark this as 2.

17                    (WHEREUPON, a certain document was

18                    marked Scavo Deposition Exhibit

19                    No. 2, for identification, as of

20                    6/19/06.)

21   BY MS. MALONE:

22       Q.    Chief Scavo, showing you what we have

23   marked as Deposition Exhibit No. 2, do you

24   recognize this document?

39

```
1      A.    Yes.

2      Q.    And what is this?

3      A.    He received an assignment as station

4    supervisor.

5      Q.    You are referring to Sergeant DeMaio?

6      A.    Yes.

7      Q.    And what was the reason that he

8    received that assignment?

9      A.    I didn't even recall that he was.  So I

10   have no recollection of a reason why.

11     Q.    Now, you said that there were two

12   deputy chiefs at the Village, Deputy Chief

13   Manteno?

14     A.    Manteno.

15     Q.    Manteno, sorry, and --

16     A.    And Deputy Chief Pitassi.

17     Q.    And what's the division of

18   responsibilities been there?

19     A.    Pitassi's juvenile, investigation,

20   tactical.  Manteno, patrol.

21     Q.    In 2003, did you have any discussion

22   with Sergeant DiMaio or with Deputy Chief Pitassi

23   with regard to a referral of Sergeant DiMaio to

24   anger management counseling?
```

40

1    A.   Yes.

2    Q.   Can you tell me the nature of your

3  discussion with Deputy Chief Pitassi regarding

4  that?

5    A.   I can't recall at this time.

6    Q.   Can you recall what your discussion was

7  with Sergeant DiMaio regarding that?

8    A.   I couldn't recall a discussion, no.

9    Q.   Do you recall the circumstances as

10  to -- the reasons why Sergeant DiMaio was

11  referred for anger management?

12    A.   The only way I would be able to recall,

13  if I read the letter or any kind of disciplinary

14  letter that I have written.  As far as a complete

15  discussion, I couldn't recall at this time.

16    Q.   There was a disciplinary letter

17  associated with that?

18    A.   I have no idea.  I would have to -- I

19  would have to check his file.

20    Q.   Do you recall any other officers other

21  than Sergeant DiMaio who were referred for anger

22  management?

23    MR. RUBERRY:  Objection.  Relevance.

24         Go ahead and answer.

41

```
 1   BY THE WITNESS:

 2       A.   I can't recall at this time, no.

 3   BY MS. MALONE:

 4       Q.   But the reason for the referral ought

 5   be reflected in Sergeant DiMaio's file?

 6       MR. RUBERRY:  Objection.  Calls for

 7   speculation.

 8            Go ahead and answer.

 9       THE WITNESS:  I'm sorry?

10       MR. RUBERRY:  You can answer.

11   BY THE WITNESS:

12       A.   Yes.

13       MS. MALONE:  Mark this as 3.

14               (WHEREUPON, a certain document was

15               marked Scavo Deposition Exhibit

16               No. 3, for identification, as of

17               6/19/06.)

18   BY MS. MALONE:

19       Q.   Showing you what we have marked as

20   Deposition Exhibit No. 3, which is a letter

21   directed to Deputy Chief Pitassi from an

22   organization called Perspectives, are you

23   familiar with this organization?

24       A.   Yes.
```

1    Q.    And what is that organization?

2    A.    I have no idea.  Obviously, it is used

3  through the Village under a title of anger

4  management.

5    Q.    Showing you this document, does this

6  refresh your recollection in any way with regard

7  to the reasons Sergeant DiMaio was referred for

8  anger management?

9    A.    No, the reasons aren't explained on

10  here.

11    Q.    Now, there's reference in here:  "It is

12  anticipated we will continue counseling for three

13  more sessions should he resume his former duties

14  as a police officer."

15        Was there a period of time in which

16  Sergeant DiMaio's duties had been altered?

17    A.    Not to my recollection.

18    Q.    Was Sergeant DiMaio working as a police

19  officer during 2002 and 2003?

20    A.    Yes.

21    Q.    Did you have any occasion to discipline

22  or suspend Sergeant DiMaio during 2002 and 2003?

23    MR. RUBERRY:  Objection.  Relevance.

24        You can go ahead and answer.

44

1    as of such-and-such a date they are paid, salary.

2    So I would report some type of a letter, not

3    explaining anything other than they have been

4    suspended since this date to that date, and no

5    pay is to be received for those dates.

6         Q.    What about Mayor Serpico, do you notify

7    him if you are suspending or disciplining a

8    police officer?

9         A.    No.

10        MS. MALONE:  Can you mark this as number 4.

11                    (WHEREUPON, a certain document was

12                    marked Scavo Deposition Exhibit

13                    No. 4, for identification, as of

14                    6/19/06.)

15   BY MS. MALONE:

16        Q.    Chief, showing you what we have marked

17   as Deposition Exhibit No. 4, this appears to be

18   an assignment of Officer Scandora to the midnight

19   shift?

20        A.    Yes.

21        Q.    Do you recall the reasons why you

22   selected various shifts for various probationary

23   officers?

24        MR. RUBERRY:  Object to the form of the

51

```
 1      A.    No.

 2      Q.    Now, you told us before that the field

 3  training officers complete monthly reports for

 4  all the probationary officers?  I'm sorry, the

 5  shift commander supervisor?

 6      A.    Right.  Yes.

 7                    (WHEREUPON, a certain document was

 8                    marked Scavo Deposition Exhibit

 9                    No. 6, for identification, as of

10                    6/19/06.)

11  BY MS. MALONE:

12      Q.    Showing you what we've marked as

13  deposition Exhibit No. 6, can you identify this

14  document?

15      A.    This is a performance review.

16      Q.    And this performance review refers to

17  Lisa Scandora?

18      A.    Correct.

19      Q.    And it is completed by Sergeant Sarni

20  as the shift commander?

21      A.    Yes.

22      Q.    You said that this is the report that

23  the shift commander would then submit to your

24  office?
```

1     A.    Correct.

2     Q.    Now, there's a reference in here to

3  area meets -- some areas where they meet --

4  indicates job requirements, some areas where the

5  shift commanders indicate an officer needs to

6  improve?

7     A.    Correct.

8     Q.    Is that unusual in a shift commander's

9  report for a probationary officer?

10     MR. RUBERRY:  Object to the form of the

11  question.  It is vague.  Incomplete hypothetical.

12  Foundation.

13          Go ahead and answer.

14  BY THE WITNESS:

15     A.    No.

16  BY MS. MALONE:

17     Q.    Is that part of the function of the

18  field training officer, to point out areas where

19  the officer ought to improve?

20     A.    This is not a report of a field

21  training officer.  This is a shift commander.

22     Q.    Right.

23          Is that one of the purposes of filling

24  these out, to point out areas where the officer

53

```
 1   might improve their performance?
 2       A.   Yes.
 3       Q.   Did you have a conversation with
 4   Sergeant DiMaio in March of 2003 with regard to
 5   Officer Scandora?
 6       A.   Not to my recollection.
 7       MS. MALONE:  Mark that as No. 7.
 8                    (WHEREUPON, a certain document was
 9                    marked Scavo Deposition Exhibit
10                    No. 7, for identification, as of
11                    6/19/06.)
12   BY MS. MALONE:
13       Q.   Do you have any -- after reviewing that
14   document, any recollection of this document?
15       A.   Yes.
16       Q.   Do you recall any -- the discussion
17   that Sergeant DiMaio referenced?
18       A.   The discussion would be exactly what's
19   on the paper.
20       Q.   Did you subsequently have a discussion
21   concerning this with Lisa Scandora?
22       A.   I don't recall if I did or didn't.
23       Q.   Do you recall telling Officer Scandora
24   that she didn't need to worry about this, that
```

54

1    she would only worry when you called her in?

2    A.    No.

3    Q.    Do you recall any discussions with

4    Officer Scandora in March of 2003?

5    A.    No.

6    Q.    Other than the recap of events that's

7    listed here, did you have any discussion with

8    Sergeant DiMaio about this incident in terms of

9    whether it ought to be written up, whether it was

10    appropriate for inclusion in the file or not?

11    A.    Yes.

12    Q.    And what did you say to him and what

13    did he say to you?

14    A.    I don't recall the exact, but I do know

15    I would probably have a conversation because I

16    definitely require my shift commanders to have

17    anything in writing.

18    Q.    And did you speak to Officer Scandora

19    to find out her version of events before putting

20    this -- having this document prepared?

21    A.    I don't recall.

22    Q.    Earlier you said that one of the things

23    you do when you are deciding other discipline or

24    reprimands is you listen to the officer's version

55

1    of events as well as the shift commander?

2        MR. RUBERRY:  I think that misstates his

3    testimony.

4           Go ahead and answer.

5    BY THE WITNESS:

6      A.   Yes.

7    BY MS. MALONE:

8      Q.   Did you do that on this occasion with

9    Officer Scandora?

10      A.   I don't recall.

11      Q.   Is it your practice to ask officers

12    when you call them in about a matter to prepare a

13    to-from?

14      A.   Yes.

15      Q.   So if you had spoken to Officer

16    Scandora about this, you would have had her

17    prepare a to-from?

18      A.   Circumstances are circumstances.  So I

19    don't recall the circumstances here.  I don't

20    recall if I had a conversation with her.

21    Sometimes I require a to-from, sometimes I

22    require a signature, which is here.  In other

23    words, she received this, she is in agreement

24    upon it, sign it.  And it wasn't -- I don't do

63

```
1                    No. 8, for identification, as of

2                    6/19/06.)

3    BY MS. MALONE:

4        Q.    Showing you what we have marked as

5    Deposition Exhibit No. 8, do you recognize this

6    document?

7        A.    Yes.

8        Q.    Is this also a performance appraisal

9    prepared by Sergeant Sarni as the shift commander

10   on or about May 23 of 2003?

11       A.    Wait a minute.  Let me see the date.

12   What date did you say?

13       Q.    May 23.

14       A.    I got April 16.

15       Q.    I stand corrected.  I have handed you

16   an incorrect document.

17       MS. MALONE:  Let me substitute what was

18   supposed to be 8 for what was previously

19   erroneously marked as 8.

20                    (WHEREUPON, a certain document was

21                    remarked Scavo Deposition Exhibit

22                    No. 8, for identification, as of

23                    6/19/06.)

24   BY MS. MALONE:
```

64

1    Q.    Now do we have the one from May 23,

2    2003?

3    A.    Yes.

4    Q.    And this again is prepared by Sergeant

5    Sarni as her shift commander?

6    A.    Yes.

7    Q.    Do you know why Sergeant Sarni is

8    preparing these and not Sergeant DiMaio?

9    A.    No.

10    Q.    Between Sergeant Sarni and Sergeant

11    DiMaio, we saw Officer Scandora was to report to

12    both of them.  Was there any priority in terms of

13    who was the -- who acted as the shift commander?

14    A.    Seniority hiring.

15    Q.    And who was more senior?

16    A.    I believe DiMaio.

17    Q.    If Sergeant DiMaio was more senior, why

18    would Sergeant Sarni be preparing these reviews?

19    MR. RUBERRY:  Objection.  Relevance.

20    Speculation.

21    Go ahead and answer.

22    BY THE WITNESS:

23    A.    I have no idea.

24    BY MS. MALONE:

1       A.      They have to pass the required classes.

2    What they might be, I have no idea.

3    BY MS. MALONE:

4       Q.      And if the officer doesn't pass the

5    examination, do you have the option of giving

6    them a second chance?

7       A.      It is the option of -- it is not my

8    option, it is their right to have a second and

9    third chance.  And I am referring only to a

10   written test.  Physical, no options.

11      Q.      And it is your testimony that your

12   involvement is not necessary in that regard?

13      A.      I am not involved with anything with

14   Cook County or the testing to become a -- someone

15   put on the Melrose Park list.

16      MS. MALONE:  Okay.  Show this as 9 and 10.

17                   (WHEREUPON, certain document were

18                   marked Scavo Deposition Exhibit

19                   Nos. 9 and 10, for identification,

20                   as of 6/19/06.)

21   BY MS. MALONE:

22      Q.      Showing you what we have marked as

23   Deposition Exhibits 9 and 10, let me ask you to

24   take a look at those letters and see if you

68

1    recall those?

2        A.    Yes.

3        Q.    And the first letter appears to be a

4    letter from the Law Enforcement Training and

5    Standards Board with regard to a failing grade by

6    candidate Negron?

7        A.    Yes.

8        Q.    And this indicates a retake -- in order

9    for him to retake the exam, you would have had to

10   make a formal request for that?

11       A.    Yes.

12       Q.    And did you make such a request for

13   Officer Negron?

14       A.    Yes.

15       Q.    And it is your testimony earlier that

16   if there's a failure on the physical, there is no

17   option for a retake?

18       A.    There is no option as far as when they

19   take the physical for the Village.  Cook County

20   has an option to retake the -- whatever item they

21   didn't pass, whether it be the mile run, situps,

22   in a certain amount of time and so on and so

23   forth.

24       Q.    So just as with this written test, the

69

1    officer that fails the power test has not a

2    retake option?

3        A.    I'm sorry?

4        Q.    An officer who fails the physical power

5    test in the academy has a retake option?

6        A.    They had a retake option without notice

7    to me at all.

8        Q.    But for the written exam it appears

9    that you have to make a formal request for a

10   retake?

11       A.    Correct.

12       Q.    Was Officer Negron involved with an

13   automobile accident during his probationary

14   period?

15       A.    I don't recall.

16       Q.    Now, this particular letter indicates

17   that Officer Negron was apparently in the academy

18   in June of 2003?

19       MR. RUBERRY:   Which particular letter are you

20   referring to, Counsel?

21       MS. MALONE:   8, 9, 10.

22       MR. RUBERRY:   That's "letters".  Okay.  You

23   said "letter."

24   BY MS. MALONE:

70

1    Q.    Would that be --

2    A.    Yeah, the date is June 17, 2003.

3    Q.    And that's consistent with your

4  recollection as well?

5    MR. RUBERRY:  Objection.  Assumes he has a

6  specific recollection about this.  Go ahead and

7  answer.

8  BY THE WITNESS:

9    A.    Yes.

10  BY MS. MALONE:

11    Q.    So Officer Negron would still have been

12  in his probationary period in 2004?

13    MR. RUBERRY:  Objection.  At what point in

14  time, Counsel?

15    MS. MALONE:  In May of 2004.

16    MR. RUBERRY:  If you know.

17  BY THE WITNESS:

18    A.    Yes.

19    MS. MALONE:  Mark this as No. 11.

20              (WHEREUPON, a certain document was

21              marked Scavo Deposition Exhibit

22              No. 11, for identification, as of

23              6/19/06.)

24  BY MS. MALONE:

71

1     Q.    Showing you what we have marked as

2  Deposition Exhibit No. 11, which appears to be a

3  to-from from Lieutenant Sansone to yourself,

4  May 22, 2004, do you recall that?

5     A.    I am reading it.  I recall.

6     Q.    This appears to relate to an automobile

7  accident which Officer Negron was found to be at

8  fault?

9     A.    Yes.

10     Q.    Did you take any disciplinary action

11  against Officer Negron as a result of this

12  incident?

13     A.    I see the suggestion of Lieutenant

14  Sansone.  Now, whether or not there was five days

15  or two days or three days, I couldn't say at this

16  time.

17     Q.    But there was some disciplinary action?

18     A.    I would assume so, without seeing his

19  whole file.

20     Q.    But it would be correct to say that

21  Officer Negron was not terminated?

22     A.    Not terminated?

23     Q.    Right.

24     A.    No.

72

1     MR. RUBERRY:  It is, no, he was not

2  terminated.

3  BY THE WITNESS:

4     A.    He was not terminated, no.

5  BY MS. MALONE:

6     Q.    Did you have a meeting with Officer

7  Negron before deciding on what disciplinary

8  action, if any, was appropriate?

9     A.    I can't recall at this time.

10     Q.    Now earlier you said -- would you have

11  asked Officer Negron to prepare a to-from?

12     A.    I would have to see it in his file.  I

13  can't recall at this time.

14     Q.    Now, earlier the from we saw had a

15  signature of Officer Scandora on it.  This one

16  does not.  Do you know why that would be?

17     MR. RUBERRY:  Objection.  The question is

18  vague and lacks foundation.  Assumes that they

19  are the same thing.  They're not.

20  BY THE WITNESS:

21     A.    No.

22  BY MS. MALONE:

23     Q.    Would -- in the normal course of

24  procedures, this had been presented to Officer

1    Negron by his shift supervisor and he would be

2    advised to either sign or not sign it?

3       A.   I can't answer that because this was

4    prepared by two -- a lieutenant and a sergeant.

5       Q.   I am just asking your normal

6    procedures.

7       A.   I don't know what their normal

8    procedures are.  My normal procedures and orders

9    are -- are different than possibly what they did

10   at this point in time.  I have no idea.  I didn't

11   prepare this document.

12      Q.   I understand that.  But your normal

13   procedure is, as with the earlier case, with

14   Sergeant DiMaio and Officer Scandora, that

15   Officer Negron would be presented with this

16   document; would that be accurate?

17      A.   Accurate, but not always true.

18      Q.   When your sergeants or lieutenants give

19   you documents that don't comport with your normal

20   procedures, wouldn't you ask them why they

21   haven't comported with your procedures?

22      MR. RUBERRY:  Objection.  Vague.  Foundation.

23   Incomplete hypothetical.  Speculation.

24           Go ahead and answer.

74

```
 1    BY THE WITNESS:

 2        A.    No.

 3    BY MS. MALONE:

 4        Q.    May I ask why not?

 5        A.    The reason --

 6        MR. RUBERRY:  Same objection.

 7              Go ahead and answer.

 8    BY THE WITNESS:

 9        A.    Because I don't know whether I had a

10    conversation with Negron.  That's where my

11    problem is.  I might have had a conversation.  At

12    this time, like I said earlier, I can't recall.

13    So the conversation might have been enough for me

14    that he didn't sign it.  This letter might be --

15    might have been presented to him in my presence,

16    and the conversation might have took place.  So

17    that's -- there's -- that's the reason being.

18    There's -- there was always an exception.

19    BY MS. MALONE:

20        Q.    Was Officer Negron involved in more

21    than one automobile accident during his

22    probationary term?

23        A.    I cannot recall at this time.

24              (WHEREUPON, a certain document was
```

```
 1      Q.    If you receive a series of reports

 2   indicating a police officer is continually

 3   needing improvement in various areas, what

 4   action, if any, will you take for probationary

 5   officers?

 6      MR. RUBERRY:  Objection.  Incomplete

 7   hypothetical.  Vague.  Foundation.  Speculation.

 8            Go ahead and answer.

 9   BY THE WITNESS:

10      A.    None.

11                 (WHEREUPON, a certain document was

12                 marked Scavo Deposition Exhibit

13                 No. 13, for identification, as of

14                 6/19/06.)

15   BY MS. MALONE:

16      Q.    Showing you what we have marked as

17   Deposition Exhibit 13, which appears to be a

18   performance review relating to Officer Negron

19   in -- for July of 2004, do you recall this

20   review?

21      A.    I am reading it now.  Do I recall at

22   that time?  No.

23      Q.    Do you recall being advised by

24   Lieutenant Sansone that Officer Negron could not
```

77

```
 1   be counted on to obey or follow through with

 2   orders?

 3        A.    No, I don't recall that.

 4        Q.    Do you recall any conversation with

 5   Lieutenant Sansone concerning Officer Negron

 6   during this time period?

 7        A.    No.

 8        Q.    Do you recall warning Officer Negron

 9   that if he had an additional accident, you were

10   going to take him away from driving a squad car?

11        A.    No.

12                    (WHEREUPON, a certain document was

13                    marked Scavo Deposition Exhibit

14                    No. 14, for identification, as of

15                    6/19/06.)

16   BY MS. MALONE:

17        Q.    Showing you what we have marked as

18   Deposition Exhibit No. 14, do you recall writing

19   this?

20        A.    No.

21        Q.    Is this your signature on this

22   document?

23        A.    Yes.

24        Q.    Now, it says:  "I have been informed
```

78

1    due to" -- I assume "your" "recent accidents."

2    This is referring to multiple accidents involving

3    Officer Negron?

4        A.    That's what it reads.

5        Q.    Does this refresh your recollection

6    that Officer Negron was involved in more than one

7    auto accident?

8        A.    No.

9        MR. RUBERRY:  I'll object to the relevance,

10   this whole line of questioning.  It is a waste of

11   time.

12   BY MS. MALONE:

13       Q.    Other than the discipline imposed by or

14   at a recommendation of Lieutenant Sansone, do you

15   recall suspending or disciplining Officer Negron

16   during his probationary period?

17       A.    No.

18       Q.    Do you recall a discussion with Officer

19   Negron in April of 2005 about voiding tickets?

20       A.    No.

21       Q.    Do you recall a discussion in January

22   of 2005 with Lieutenant Potamianos about serious

23   concerns about Officer Negron?

24       A.    No.

```
 1                  (WHEREUPON, a certain document was
 2                  marked Scavo Deposition Exhibit
 3                  No. 15, for identification, as of
 4                  6/19/06.)
 5    BY MS. MALONE:
 6        Q.    Showing you what we have marked as
 7    Deposition Exhibit No. 15, it appears to be a
 8    letter dated January 3, 2005 from Lieutenant
 9    Potamianos to yourself.  Do you recall this
10    letter?
11        A.    I am reading it.
12        Q.    Sorry, Chief.  Do you recall this
13    letter?
14        A.    It is to me, so I recall it, yes.
15        Q.    And as a result of this letter, was any
16    action taken regarding Officer Negron?
17        MR. RUBERRY:  Objection.  Relevance.
18    BY THE WITNESS:
19        A.    At this time, I don't recall.
20    BY MS. MALONE:
21        Q.    But Officer Negron was not terminated,
22    would that be fair to say?
23        A.    Definitely.
24        Q.    Do you recall a discussion with Officer
```

80

1    Scandora in August or September of 2003

2    concerning Sergeant DiMaio?

3        A.    No.

4        MR. RUBERRY:  Objection.  Assumes facts not

5    in evidence.

6    BY MS. MALONE:

7        Q.    Do you recall any discussions in August

8    or September of 2003 with Officer Scandora?

9        MR. RUBERRY:  Same objection.  Also, vague.

10           Go ahead and answer.

11   BY THE WITNESS:

12       A.    No.

13   BY MS. MALONE:

14       Q.    Do you recall any discussions in

15   October of 2003 with Officer Scandora?

16       A.    No.

17       Q.    Do you recall any occasion on which you

18   spoke to Officer Scandora with regard to Sergeant

19   DiMaio?

20       A.    No.

21       Q.    Do you recall any occasion on which she

22   expressed concern to you about her treatment by

23   Sergeant DiMaio?

24       A.    No.

1      Q.    Do you recall any occasion on which she

2 expressed a concern about Sergeant DiMaio's

3 attitude towards women?

4      MR. RUBERRY:   Object to the form of the

5 question.   Vague.   Foundation.

6         Go ahead and answer.

7 BY THE WITNESS:

8      A.    No.

9 BY MS. MALONE:

10      Q.    So we're clear, when you have a

11 meeting -- you said earlier you have kind of an

12 open-door policy with the officers, would that be

13 fair?

14      A.    Yes.

15      Q.    So that an officer who has a question

16 or concern can come to you and talk to you about

17 it directly?

18      A.    Yes.

19      Q.    Did you from time to time during

20 Officer Scandora's employment have discussions

21 with her directly?

22      A.    At this time, I don't recall.

23      Q.    Did you have discussions from time to

24 time during 2003 and 2004 with other probationary

82

1    police officers?

2        MR. RUBERRY:   Objection, vague.   Foundation.

3    BY THE WITNESS:

4        A.    I don't recall.

5    BY MS. MALONE:

6        Q.    Did you have any discussions with

7    Jackie McMillan of the Village of Melrose Park

8    personal department regarding Sergeant DiMaio?

9        A.    I don't recall.

10                    (WHEREUPON, a certain document was

11                    marked Scavo Deposition Exhibit

12                    No. 16, for identification, as of

13                    6/19/06.)

14    BY MS. MALONE:

15       Q.    Showing you what we have marked as

16    Exhibit 16, which appears to be a letter dated

17    August 11 of 2003, have you ever seen this letter

18    before?

19       A.    If this was in his file, but it is

20    addressed to McMillan, no.

21       Q.    If it was in his file that was at the

22    police department, would you normally have seen

23    it before it being included within his file?

24       A.    Yes.

1       Q.      Do you have any recollection with

2   regard to the attitude problem that caused

3   Mr. DiMaio to be referred to the Perspectives?

4       MR. RUBERRY:   Objection.   Relevance.   Asked

5   and answered.

6           Go ahead and answer.

7   BY THE WITNESS:

8       A.      Not real clearly, but I do remember a

9   problem.

10  BY MS. MALONE:

11      Q.      And what do you recall about that

12  problem?

13      A.      That he -- that it was reported he had

14  an attitude problem on a call, and at that point

15  in time, we decided to get him enrolled in order

16  to nip the problem in the bud.

17      Q.      And what type of attitude problem did

18  he have?

19      A.      I can't recall at this time.

20      MR. RUBERRY:   Objection.   Asked and answered.

21  Relevance.

22  BY MS. MALONE:

23      Q.      But it related to his actions on a call

24  for service?

84

1      MR. RUBERRY:  Objection.  Relevance.  Asked

2  and answered.

3  BY THE WITNESS:

4      A.    Yes.

5  BY MS. MALONE:

6      Q.    Do you recall who reported it to you?

7      A.    No.

8      Q.    Was it another police officer?

9      A.    I can't recall at this time.

10      Q.    If there is a report of an attitude

11  problem or problem on a call, I thought earlier

12  you had said it is your policy that things are to

13  be done in writing?

14      MR. RUBERRY:  Mischaracterizes his testimony.

15  It is also vague.  Go ahead and answer if you

16  understand it.

17  BY THE WITNESS:

18      A.    I don't understand it.

19  BY MS. MALONE:

20      Q.    Okay.  If a police officer -- if a

21  problem is reported that relates to a police

22  officer's conduct on a call, should that report

23  be completed in writing?

24      A.    It depends who -- I don't know how it

1    Deposition Exhibit No. 17, this should be a

2    document dated September 4.  What is this

3    document?

4       A.    First of all, I got September 16.

5       MS. MALONE:  I did it again.  Here's document

6    September 4, and swap that one.  Patrick, did you

7    get the right one?

8       MR. RUBERRY:  Yeah.  Leave it on.  Leave it

9    on.

10      MS. MALONE:  Okay.

11   BY MS. MALONE:

12      Q.    Now do you have September 4?

13      A.    Yes.

14      Q.    And what is that document?

15      A.    Notifying Scandora that she's been

16   reassigned to another shift, Lieutenant

17   Sansone's.

18      Q.    And do you recall the circumstances for

19   that reassignment?

20      A.    I doubt if there are any circumstances,

21   but I don't recall any.

22      Q.    Do you recall having any discussion

23   with Officer Scandora about this reassignment?

24      A.    No.

89

1      Q.    Do you recall her thanking you for the

2   reassignment?

3      A.    No.

4      Q.    Did you have any opportunity through

5   this point in time to review or observe Officer

6   Scandora's work performance?

7      A.    When she was -- no.

8      Q.    Did you -- as of September of 2003, had

9   you formed any opinions of her work performance?

10      A.    I thought she was doing well.

11      MR. RUBERRY:   I object to the point when you

12   say -- did you say September 2003?

13      MS. MALONE:   Right.

14      MR. RUBERRY:   Okay.

15   BY MS. MALONE:

16      Q.    Do you recall any conversation with

17   Officer Scandora in October or November of 2003

18   with regard to Sergeant DiMaio?

19      A.    No.

20      Q.    Do you recall any conversation with

21   Sergeant DiMaio in October or November of 2003

22   concerning Officer Scandora?

23      A.    No.

24      Q.    Did you have any conversation during

90

1    October, November of 2003 with anyone concerning

2    Officer Scandora, that you can recall?

3        A.    I cannot recall.

4        Q.    Did there come a point in time in the

5    later part of November 2003 that Officer Scandora

6    was injured in a car accident?

7        A.    If -- there was a car accident.  With

8    the date, I am not certain of.

9        Q.    Were you on duty when that accident

10   occurred?  I'm sorry, were you in the station

11   when the accident occurred?

12       A.    If -- I can't recall the time, but I

13   wouldn't be in there in the middle of the night,

14   no.

15       Q.    Do you recall how you learned of the

16   accident?

17       A.    I was informed of the accident by

18   someone.  I'm -- at this time, I don't know who.

19       Q.    Was Officer Scandora injured in that

20   accident?

21       A.    I believe so, yes.

22       Q.    Did you have a discussion with Officer

23   Scandora regarding her duty status following that

24   accident?

1      A.    Yes.

2      Q.    And how did you come to have that

3    discussion?

4      A.    I believe she came into me after the

5    accident and said that she really didn't want to

6    be off and was wanting to get light duty, and I

7    told her if she could get a light-duty notice,

8    that she could work -- from her doctor, to make

9    sure that we weren't under any liability, it

10   would be fine.

11     Q.    Was anyone else present during this

12   discussion?

13     A.    Not that I recall.

14                (WHEREUPON, a certain document was

15                marked Scavo Deposition Exhibit

16                No. 18, for identification, as of

17                6/19/06.)

18   BY MS. MALONE:

19     Q.    Showing you what we have marked as

20   Deposition Exhibit No. 18, do you recall this

21   order?

22     A.    Yes.

23     Q.    And this order states that light-duty

24   positions were eliminated as of the effective

92

1    date of this order?

2        A.    Yes.

3        Q.    At the time you say that you met with

4    Officer Scandora, did she have her leg in a cast?

5        A.    I can't recall.

6        Q.    Do you recall what the nature of her

7    injury or ailment was?

8        A.    No.

9        Q.    Can you tell us any other police

10   officer in 2003 or 2004 that you can recall being

11   assigned to a light duty position?

12       A.    I would have to check the files.  No.

13   Not at this time.

14       Q.    How about broadening it, five years,

15   can you recall anybody working in a light duty

16   position?

17       A.    There's been -- I know of one right now

18   who I had, I think, a broken hand, or -- no.

19   Knee.  It was a knee.

20       Q.    And he's working in a light duty

21   position?

22       A.    He just came off of it.  It is more or

23   less a voluntary position.

24       Q.    Other than this individual who -- I

98

```
 1    The shift commanders do.  They make their own

 2    notations.

 3        Q.    Directing your attention to the last

 4    page on this exhibit, by Officer Scandora,

 5    there's a note, "gone, let go."  Do you know

 6    who's notation that is?

 7        A.    No.

 8        Q.    These schedules, where are they

 9    normally kept?

10        A.    I don't know which one this is.  If

11    this is Sarni's or DiMaio's, they have their own,

12    then they turn one into Deputy Chief Manteno.

13        Q.    Chief, in December of 2003, did you

14    have any discussion with Celia Arellano

15    concerning Officer Scandora?

16        A.    Yes.

17        Q.    And how -- do you recall the date of

18    that discussion?

19        A.    No.

20        Q.    Do you recall how it happened that she

21    came to talk to you?

22        A.    Scandora approached Angela Williams,

23    one of our clerks in records, and had left a note

24    for Celia, stating that Scandora was requesting I
```

99

1    believe the recorded tapes from our 911 desk.

2        Q.    So Ms. Arellano came to you and said

3    she had received this note from Ms. Williams?

4        A.    Correct.

5        Q.    And what was Officer Scandora's duty

6    status at the time you had this conversation with

7    Ms. Arellano?

8        A.    I have no -- I can't recall at this

9    time.  I do know one thing for sure, it was after

10   the accident.  Now, what her duty assignment was,

11   she is light-duty or off, I can't recall.

12       Q.    Did you ask Ms. Arellano when this had

13   transpired?

14       A.    What's that?

15       Q.    Ms. Arellano had a note from

16   Ms. Williams?

17       A.    No, I don't recall what I said, other

18   than she came in.  I don't know if it was the

19   date before she got the note or that day or --

20       Q.    So Ms. Arellano came in and said she

21   got this note from Ms. Williams?

22       A.    Correct.

23       Q.    Did you have any discussion with

24   Ms. Williams concerning this?

100

1    A.   Yes.

2    Q.   And what was the nature of your

3  discussion with Ms. Williams?

4    A.   Just to verify that she did request

5  these tapes from her.

6    Q.   And what, to your best recollection,

7  did Ms. Williams say to you and what did you say

8  to her?

9    A.   I asked her -- I said, "Angela, did

10  Scandora ask you for the tapes?" And she said,

11  "Yes. And I told her that I have nothing to do

12  with the tapes, and the only one that could give

13  you the tapes would be the chief. And Celia is

14  in charge of it, so if you have any questions

15  about it, ask Celia." And then she says, "I will

16  leave her a note telling her that you are

17  requesting the tapes."

18    Q.   And that's what Angela did, she left a

19  note for Celia just like she told Officer

20  Scandora she would do?

21    A.   Yes, she did.

22    Q.   So after Ms. Arellano came to you and

23  told you this, what did you do then?

24    A.   I told her that she is not allowed to

101

```
 1    get the tapes, and if she's requesting the tapes,

 2    she can come into me, and I will speak to her

 3    about it.

 4        Q.    Did you have any discussions with

 5    Officer Scandora about that?

 6        A.    At a later point -- I'm sorry.  At a

 7    later point of time, yes.

 8        Q.    After your discussion with

 9    Ms. Arellano, did you then have any discussions

10    concerning this with anyone else?

11        A.    The tapes?

12        Q.    Right.

13        A.    No.

14        Q.    Did you have any discussion about it

15    with Sergeant DiMaio?

16        A.    I can't -- there was several things

17    going on at that time.  I can't recall if I ever

18    had a discussion about the tapes.  Very well

19    could have, but I'm not certain.  Not at that

20    time.

21        Q.    I'm sorry, several things are going on.

22    Did they relate to Officer Scandora?

23        A.    Yes.

24        Q.    What else was going on at that time
```

102

1    relating to Officer Scandora?

2        A.    She had requested photographs from the

3    accident investigator.  She had requested the

4    tapes again, from a clerk called Caputo, Kristie

5    Caputo.  There was another person.  There

6    was Rinella, Caputo, Celia, Angela, and there was

7    a fifth person.  I can't recall.

8        Q.    How did you become aware of Officer

9    Scandora's conversation with Officer Rinella?

10       A.    He came in and talked to me.

11       Q.    Was this before or after Ms. Arellano?

12       A.    I can't remember.

13       Q.    Did you ask him to prepare a to-from?

14       A.    I can't remember that.  At one point in

15   time during this all going on, I know I spoke

16   to -- I believe it was both Sarni and DiMaio, to

17   ask -- to converse with Scandora if she

18   understood that this was not something that was

19   proper and that she would not be able to -- I

20   think the photographs were first.  You know, it

21   is a couple years ago, but I think the

22   photographs were first.  And I think then there

23   was a discussion.

24       Q.    Okay.  I just want to make sure I am

103

1    clear --

2        A.    You know, I am not clear.  So how am I

3    going to make it clear to you?

4        Q.    Okay.  So you're --

5        A.    Because I can't remember the order.

6        Q.    So Officer Rinella came into your

7    office and said what?

8        A.    That Scandora wanted a copy of all the

9    photographs of the accident.

10        Q.    And what did you say to Officer

11    Rinella?

12        A.    Don't give her anything.

13        Q.    Okay.  And you can't remember whether

14    this was before or after your conversation with

15    Ms. Arellano?

16        A.    Right.

17        Q.    And you said there was also a request

18    that you were made aware of regarding Kristie

19    Caputo?

20        A.    Right.

21        Q.    And what's Miss Caputo's position?

22        A.    She no longer works for us, that's one.

23    She was just a data entry girl.

24        Q.    And how did you become aware of

104

1    Ms. Scandora's conversation with Ms. Caputo?

2        A.    She also told me.

3        MR. RUBERRY:    "She" being whom?

4        THE WITNESS:    Kristie Caputo.

5    BY MS. MALONE:

6        Q.    Was this before or after your

7    conversation with Mr. -- Officer Rinella?

8        A.    You know, chronologically, I will never

9    be able to remember that.  So I don't know.  I

10   don't know if Celia came in first, Rinella came

11   in first, Caputo came in first, or Angela

12   Williams came in first.

13       Q.    And what did Ms. Caputo tell you?

14       A.    That she was requesting the tapes.

15       Q.    "She" being Officer Scandora?

16       A.    Correct.

17       Q.    And what did you tell Ms. Caputo?

18       A.    I don't even think I even answered her

19   because she was so far out of the mix about even

20   knowing what she was talking about, being

21   Scandora.  Like I said, she was strictly

22   100 percent data entry.

23       Q.    Did you make any notes of these

24   conversations that you had with these

1    individuals?

2        A.    Like I was beginning to say, there was

3    a -- I had told Sarni and DiMaio that Scandora

4    needs to be told, and that if she needs anything,

5    I will be more than happy to turn them over to

6    you.  But she can't run around asking people like

7    Celia or Caputo or Angela, so on and so forth.

8    This is things that are confidential to the

9    department.  And I believe at that time I asked

10   them to put it in writing.

11       THE VIDEOGRAPHER:  Going off the record at

12   12:21 p.m.

13               (WHEREUPON, a recess was had.)

14       THE VIDEOGRAPHER:  We are back on the record

15   at 12:28 p.m.

16   BY MS. MALONE:

17       Q.    Chief, you told us that Officer Rinella

18   came to you and Ms. Arellano, and you told them

19   not to give Officer Scandora any documents or

20   tapes, correct?

21       A.    Correct.

22       Q.    All right.  You also told us that you

23   would have been happy to give her copies of those

24   documents had she made a request to you; is that

1  correct?

2      A.    Correct.

3      Q.    You did not ask Officer Rinella to make

4  any -- write any to-from as to his conversation

5  with Officer Scandora?

6      A.    No.  You know, if I could see the

7  to-froms that we have, then I could probably make

8  more sense out of this myself because I just

9  can't recall.

10     Q.    I am just asking, there was no to-from

11 from Officer Rinella?

12     A.    I don't know.

13     Q.    But you made no notes of your

14 conversations with Ms. Arellano or Ms. Caputo?

15     A.    Notes?

16     Q.    Right.

17     A.    No.

18     Q.    Did you contact Officer Scandora

19 regarding these requests yourself?

20     A.    No.

21     Q.    May I ask why not?

22     A.    I felt as though if she needed the

23 information and it was that important to her,

24 that she would come to see me.  And, again, if I

108

 1   office?

 2      A.    I don't recall saying that at all.

 3      MR. RUBERRY:  Mischaracterizes his testimony.

 4   BY MS. MALONE:

 5      Q.    I'm sorry.  So you didn't tell them to

 6   tell her that you could get those document upon

 7   request?

 8      A.    I don't recall.

 9      Q.    If she had made a request to you, would

10   you have given her the documents?

11      MR. RUBERRY:  Asked and answered.

12            Go ahead and answer it.

13   BY THE WITNESS:

14      A.    If, in fact, it was something that was

15   without putting anybody in jeopardy, my liability

16   as the police chief, the Village, so on and so

17   forth.

18   BY MS. MALONE:

19      Q.    And just so we're clear, these records

20   that she was inquiring about were the records of

21   the auto accident in which she had been injured?

22      A.    She wanted photographs, she wanted the

23   tapes.

24      Q.    But the accident that she was inquiring

1    about is the one where she sustained injuries?

2       A.   That she was inquiring for the tapes

3    and the photos?

4       Q.   Right.

5       A.   Yes.

6       Q.   I just wanted to be clear, it is not

7    some other accident that she has no involvement

8    with, it is the one where she had been injured on

9    duty, right?

10      A.   Correct.

11      Q.   And you instructed Sergeant DiMaio and

12    Sergeant Sarni to provide this direction to

13    Officer Scandora in writing?

14      A.   I can't recall.

15      Q.   You can't recall if this is the

16    directive you gave them?

17      A.   No, I can't.

18      Q.   Do you recall the date on which you

19    gave them this directive?

20      A.   I can't recall giving them the

21    directive.

22      Q.   I'm sorry.

23          The conversation that you said -- you

24    referenced earlier with Sergeant Sarni and

1    Sergeant DiMaio, do you recall the date on which

2    this conversation occurred?

3        A.    No.

4        Q.    Do you recall whether Sergeant Sarni

5    and Sergeant DiMaio were working?

6        A.    No.

7        Q.    The reason I ask, sir, if you look back

8    to Deposition Exhibit No. 1, the second to last

9    page?

10       MR. RUBERRY:  Why don't you give the month or

11   whatever.

12   BY MS. MALONE:

13       Q.    It is the schedule for November the

14   13th of 2003 to December the 10th of 2003.  And

15   from the time period of November 29 of 2003 to

16   the end of this time period, were there any days

17   on which both Sergeant DiMaio and Sergeant Sarni

18   were both working?

19       A.    4th, 5th, 6th, 7th -- oh, no, no, no.

20   Wait, wait.  I was looking at the wrong guy.

21             From which date?

22       Q.    From November the 29th until

23   December the 10th?

24       A.    No.  There's no date in that time

1    period where they both were working.

2        Q.    Would you have called either Sergeant

3    DiMaio or Sergeant Sarni in while they were off

4    duty to give them this directive?

5        A.    I can't recall if I would or wouldn't.

6        Q.    Who is Lieutenant Klugger?

7        MR. RUBERRY:  In what sense?

8    BY MS. MALONE:

9        Q.    Do you know -- he is employed by the

10   Village of Melrose Park?

11       A.    No longer.  He is retired.

12       Q.    Was he in 2003?

13       A.    Yes.

14       Q.    Now, earlier we talked a little bit

15   about the chain of command --

16       MR. RUBERRY:  Wait a minute, wait a minute.

17   He is retired in 2003 or he is working in 2003?

18   It is not clear.

19   BY MS. MALONE:

20       Q.    He was working in 2003; is that

21   correct?

22       A.    Working, correct.

23       Q.    All right.  Earlier when we talked

24   about the chain of command, you had said that it

112

1    would run from Sergeant DiMaio and Sarni to

2    deputy chief, or in his absence, directly to

3    yourself, right?

4        A.    Yes.

5        Q.    And I take it the officers chain of

6    command would run to the sergeants and then to

7    the deputy chief and then to yourself?

8        A.    Unless he is a lieutenant.

9        Q.    And in November of 2003 to December 10

10   of 2003, Lieutenant Potamianos, looks like he was

11   on vacation from the 27th to the end of the

12   period; is that correct?

13       A.    Yes.

14       Q.    So the chain of command from the

15   officers would run through the sergeant to the

16   deputy chief to yourself?

17       A.    Yes.

18       Q.    But you said you also maintained an

19   open-door policy where it was not unusual for

20   police officers to discuss things with you

21   directly?

22       A.    Yes.

23       Q.    Where was Lieutenant Klugger, where was

24   his duty assignment at that point in time?

116

1    maintained in the Village, is that behind a door

2    to which access is gained through a key card?

3        A.    Yes.

4        Q.    And if an officer has crutches, should

5    the officer bring their crutches into the lock up

6    with them?

7        A.    If it aids them to walk, that's

8    entirely up to them.

9        Q.    Are you aware of any officer other than

10   Officer Scandora who was assigned to the -- to

11   work in the lock up while in a cast?

12       A.    I wasn't aware that she was assigned

13   there or that she was back there with crutches or

14   a cast.

15       Q.    Who would have assigned her there?

16       A.    That would be up to the shift

17   commanders of the midnight shift.

18       Q.    Which would be Sergeant DiMaio in the

19   absence of Sergeant Sarni?

20       A.    Or Lieutenant Potamianos.

21       Q.    If Lieutenant Potamianos and Sergeant

22   Sarni were not there, it would have been Sergeant

23   DiMaio who would have decided to assign her

24   there?

1    MR. RUBERRY: Objection. Calls for

2  speculation. Foundation.

3        Don't guess. Go ahead and answer if

4  you can.

5  BY THE WITNESS:

6    A.   Yes.

7  BY MS. MALONE:

8    Q.   Sir, this particular document is dated

9  December 16, 2003, and it is signed by yourself.

10  Did you sign it on or about December 1, 2003?

11    A.   I would imagine, yes.

12    Q.   Now, in this document, it states that

13  Officer Scandora has violated an order and that

14  if she didn't like an answer, she was to go see

15  Lieutenant Klugger or Deputy Chief Caputo.

16        Earlier I think you told us that

17  Officer Scandora could have submitted a request

18  to your office for permission to see these tapes;

19  would that be true?

20    A.   I have an open-door policy. If she

21  would have came directly to me, yes.

22    Q.   When you saw this document on or about

23  December 1 of 2003, did you direct Sergeant

24  DiMaio to tell Officer Scandora that, that she

118

1    could come directly to your office and request

2    these tapes?

3        A.    Not to my recollection.

4        Q.    Prior to this December 1 of 2003

5    letter, had Officer Scandora, to your knowledge,

6    been reprimanded or disciplined in any manner?

7        A.    Reference the accident?

8        Q.    Reference anything.

9        A.    I would have to look at her file.  I

10   can't recall at this time.

11       Q.    But if she had been, it should be

12   reflected in her file?

13       A.    Yes.

14       MR. RUBERRY:  Objection.  Calls for

15   speculation.

16   BY MS. MALONE:

17       Q.    And with regard to this letter, how are

18   we to view this letter?  Is this a warning, is it

19   a reprimand, what type of letter is this?

20       A.    This is a warning.

21       MR. RUBERRY:  For the record, you are

22   referring to 19?

23       MS. MALONE:  Right.

24   BY MS. MALONE:

119

1    Q.   When you saw this letter in which

2 Sergeant DiMaio is telling Officer Scandora that

3 she needs to see Lieutenant Klugger, did you

4 correct Sergeant DiMaio?

5    A.   On what grounds?

6    Q.   On the grounds that he ought to have

7 instructed her that she could submit the request

8 directly to you?

9    A.   No.

10    Q.   May I ask why not?

11    A.   I have an open-door policy.  She knew

12 she could walk in.

13    Q.   So she knew -- she should have known

14 there was nothing wrong with her coming directly

15 to you?

16    A.   Absolutely.

17    Q.   Do police officers from time to time

18 ask each other questions if they are unclear as

19 to what the policies and procedure are?

20    MR. RUBERRY:  Objection.  Calls for

21 speculation.  Vague.  Foundation.  Incomplete

22 hypothetical.

23          Go ahead and answer.

24 BY THE WITNESS:

120

```
 1       A.    I can't answer that.
 2   BY MS. MALONE:
 3       Q.    Do police officers from time to time
 4   make inquiries of Ms. Arellano?
 5       MR. RUBERRY:  Same objection.
 6   BY THE WITNESS:
 7       A.    I can't answer that, also.
 8   BY MS. MALONE:
 9       Q.    When Ms. Arellano came to you and said
10   she had gotten this note from Ms. Williams, was
11   that the first time Ms. Arellano has ever come to
12   you said a police officer is requesting access to
13   something?
14       A.    I can't recall.
15       Q.    When Officer Rinella came to you and
16   said that Officer Scandora was requesting access
17   to information concerning her accident, was that
18   the first time any police officer has told you
19   another officer is making a request for
20   information?
21       MR. RUBERRY:  Objection.  Relevance.  Vague.
22             Go ahead and answer.
23   BY THE WITNESS:
24       A.    I can't recall.
```

121

1    BY MS. MALONE:

2        Q.    This directive that you had told

3    Sergeant DiMaio and Sergeant Sarni to give to

4    Officer Scandora saying she could come directly

5    to you and get this material, had you ever given

6    a similar directive to any other supervisor?

7        MR. RUBERRY:  Objection.  Vague.

8    BY THE WITNESS:

9        A.    I can't recall.

10       MR. RUBERRY:  Foundation.

11   BY MS. MALONE:

12       Q.    Had you ever instructed another

13   supervisor to clarify a policy or procedure for a

14   patrol officer?

15       MR. RUBERRY:  Same objection.  It is

16   hopelessly vague.  Overbroad.

17           Go ahead and answer if you can.

18   BY THE WITNESS:

19       A.    In writing, I can't answer yes.

20   Verbally, definitely.

21   BY MS. MALONE:

22       Q.    So someone may have a question on a

23   policy or procedure, and you will call in their

24   supervisor and say, "hey, would you tell officer

122

```
1    so and so this is the way you are supposed to do

2    things"?

3        A.    Yes.

4        Q.    And that's probably not an uncommon

5    occurrence?

6        A.    No.

7        Q.    Would it be more common for you to

8    provide that clarification or directive to the

9    supervisors verbally than in writing?

10       MR. RUBERRY:  Objection.  Relevance.  Vague.

11   Foundation.  Incomplete hypothetical.

12            Go ahead and answer.

13   BY THE WITNESS:

14       A.    Depends on the circumstances.

15   BY MS. MALONE:

16       Q.    What circumstances would cause you to

17   want that directive to be in writing?

18       MR. RUBERRY:  Same objection.  Go ahead and

19   answer.

20   BY THE WITNESS:

21       A.    As I said earlier, this clarifies it.

22   Rinella was spoken to first over the photographs.

23   And then she went after -- then she went to

24   Celia, and Scandora was verbally told about the
```

123

1    photographs by DiMaio.  That was my first

2    conversation with DiMaio.  And could have been

3    Sarni.  I am not certain about Sarni being there.

4    BY MS. MALONE:

5        Q.    So prior to December 1 of 2003 you had

6    a conversation with --

7        A.    Rinella came in and spoke to me.  He

8    was the first.

9        Q.    And you spoke to DiMaio?

10       A.    And could have been Sarni, also.

11       Q.    And that was before December 1 of 2003?

12       A.    That was -- I don't know, what was the

13   date of the accident?

14       Q.    I believe it was on or about the 28th

15   or 29th.

16       A.    Okay.  Then it was before this letter

17   was written.  The request by her to Rinella for

18   the photographs was first.  Then the note for

19   Celia was second.

20       Q.    And both of those occurred prior to

21   December 1 of 2003?

22       A.    Both?  What both?

23       Q.    This December 1 of 2003 note refers

24   to --

124

1    A.    This is the note.

2    Q.    This refers to her -- by going to desk

3  supervisor Arellano --

4    A.    This was the note.  The photographs

5  were Rinella.  So Rinella was first, the note was

6  second.

7    Q.    And Officer Rinella came to see you

8  before December 1 of 2003 with this, as did desk

9  supervisor Arellano?

10    MR. RUBERRY:  Objection.  Compound.  Vague.

11          Do you understand the question?  If you

12  don't, don't answer it.

13  BY THE WITNESS:

14    A.    As I said before, Rinella came first,

15  then Arellano.

16  BY MS. MALONE:

17    Q.    Was Officer Rinella on duty when he had

18  the conversation with Officer Scandora?

19    MR. RUBERRY:  Objection.  Calls for

20  speculation.

21  BY THE WITNESS:

22    A.    I can't answer that.

23  BY MS. MALONE:

24    Q.    Did you ask him?

125

1      MR. RUBERRY:  Same objection.

2            Go ahead and answer.

3    BY THE WITNESS:

4      A.    Can't recall.

5    BY MS. MALONE:

6      Q.    Was Officer Scandora on duty when she

7    had the conversation with Officer Rinella?

8      MR. RUBERRY:  Objection.  Speculation.

9    BY THE WITNESS:

10     A.    No idea.

11   BY MS. MALONE:

12     Q.    Was Officer Scandora on duty when she

13   had the conversation with Ms. Williams?

14     MR. RUBERRY:  Objection.  Relevance.

15   Speculation.

16   BY THE WITNESS:

17     A.    No idea.

18   BY MS. MALONE:

19     Q.    But at the time this letter was

20   written, December 1 of 2003, you and Sergeant

21   DiMaio were aware that Officer Scandora had had a

22   conversation with Officer Rinella?

23     A.    Yes.

24     Q.    And just so we are clear in here,

126

1    Sergeant DiMaio says that Officer Scandora went

2    directly to desk supervisor Arellano.  In fact,

3    Officer Scandora made an inquiry of Ms. Williams

4    who left a note for Ms. Scandora; is that

5    correct?

6        MR. RUBERRY:  Objection.  Calls for

7    speculation.

8    BY MS. MALONE:

9        Q.    That was your information; is that

10   correct, sir?

11       A.    Yes.

12       Q.    Did you call in Officer Scandora and

13   have any conversation with her concerning this

14   matter?

15       A.    At what time?

16       Q.    In December 1 of 2003, before this

17   document was written.

18       A.    Well, the document was written on

19   December 1.

20       Q.    Right.

21             You had no conversation with Officer

22   Scandora before this was prepared and signed?

23       A.    Not at this time, no.

24       MR. RUBERRY:  We have 12:50 on my watch.  I

132

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF ILLINOIS

 3                    EASTERN DIVISION

 4

 5   LISA SCANDORA,                    )

 6                   Plaintiff,        )

 7        vs.                          ) No. 05 C 1206

 8   VILLAGE OF MELROSE PARK, and      )

 9   VITO R. SCAVO, individually,      )

10                   Defendants.       )

11

12            The continued videotaped deposition of

13   VITO SCAVO, called for examination, taken pursuant

14   to the Federal Rules of Civil Procedure of the

15   United States District Courts pertaining to the

16   taking of depositions, taken before NICOLE SCOLA,

17   CSR No. 084-004524, a Notary Public within and for

18   the County of DuPage, State of Illinois, and a

19   Certified Shorthand Reporter of said state, at

20   Suite 1745, 20 North LaSalle Street, Chicago,

21   Illinois, on the 19th day of July, A.D. 2006, at

22   9:15 a.m.

23

24
```

133

```
 1    PRESENT:

 2

 3         SUSAN P. MALONE, ATTORNEY AT LAW,

 4         (20 North LaSalle Street, Suite 1745,

 5         Chicago, Illinois  60606,

 6         312-726-2638),

 7              appeared on behalf of the Plaintiff;

 8

 9         DOWD & DOWD, LTD.,

10         (617 West Fulton,

11         Chicago, Illinois  60661,

12         312-704-4400), by:

13         MR. PATRICK J. RUBERRY,

14              appeared on behalf of the Defendants.

15

16

17    ALSO PRESENT:

18         Mr. Scott Johnson, Legal Videographer,

19         Esquire Deposition Services.

20

21

22

23    REPORTED BY:  NICOLE M. SCOLA, CSR, RPR,

24              C.S.R. Certificate No. 84-4524.
```

136

1          Do you recall that testimony?

2     A.   Yes.

3     Q.   And you also told us that

4 Officer Rinella came to you before Celia Arrellano

5 and told you that Scandora had requested access to

6 photos?

7     A.   Yes.

8     Q.   Okay.  And I've -- forgive me if I have

9 asked you this before, but when Officer Rinella

10 came to you and told you this, you said that you

11 had told him not to give Officer Scandora

12 anything.

13          Do you recall that testimony?

14     A.   No.  But I definitely probably said

15 that.

16     Q.   After you had your conversation with

17 Officer Rinella, did you have any conversations

18 with anyone else?  I think you told us you talked

19 to Detective DiMaio and Detective Sarni?

20     MR. RUBERRY:  Which question do you want him

21 to answer?  There are two -- or three perhaps.

22     MS. MALONE:  You're right.  I'll rephrase

23 that.

24 BY MS. MALONE:

137

```
 1        Q.     After you talked to Officer Rinella,

 2   you talked to Sergeant DiMaio and Sergeant Sarni;

 3   is that your testimony?

 4        A.     I don't recall, but I'm sure I spoke to

 5   them.

 6        Q.     Okay.

 7        A.     I think at that time, they were

 8   lieutenants, though, weren't they?  They might

 9   have been sergeants.  It doesn't matter.

10        Q.     Okay.  Now, I take it, sir -- do you

11   recall the date you spoke to Officer Rinella or to

12   Celia Arrellano?

13        A.     No.

14        Q.     But it would have been sometime after

15   Officer Scandora's accident?

16        A.     Yes.

17        MS. MALONE:  Could we mark this as 19 -- as

18   20, I believe.

19                         (WHEREUPON, a certain document

20                         was marked Scavo Deposition

21                         Exhibit No. 20, for

22                         identification, as of 7/19/06.)

23   BY MS. MALONE:

24        Q.     Sir, showing you what we've marked as
```

138

1    Deposition Exhibit No. 20, can you identify this

2    document?

3         A.    It's a schedule -- a work schedule.

4         Q.    And does the second page of this

5    document refer to the work schedule of the

6    dispatchers?

7         A.    Yes.

8         Q.    And according to this document,

9    Ms. Arrellano was off from the 27th of November to

10   the 30th?

11        A.    Well, this isn't my schedule, so I

12   don't know what "HH" means, but she's definitely

13   off on the 29th and 30th.

14        Q.    Is the 27th of November -- would that

15   have been Thanksgiving?

16        A.    Yes.

17        Q.    Is that a holiday?

18        A.    It could have been.  I don't know.

19        Q.    Okay.

20        A.    That doesn't show here.

21        Q.    Was Ms. Arrellano working when she came

22   to speak to you?

23        A.    I don't recall.

24        Q.    Does this refresh -- refresh your

141

1   Rinella, prior to Celia, prior to Angela Williams,

2   prior to Chrissy Caputo -- I have no idea; but it

3   was all within, I would say, a week or so, and it

4   was definitely after the accident.  That's all I

5   remember.

6        Q.    Now, earlier, you had told us about a

7   form you had initiated for access to audiotapes.

8            Do you recall that?

9        A.    Yes.

10       Q.    Where were those forms located?

11       A.    I have no idea.  Either they're --

12  they'd be in a report writing room -- box that we

13  have, different forms, or it could be in Celia's

14  possession.

15       Q.    Is that a form that is included in the

16  general orders given out to the police officers?

17       A.    I don't know at this time.

18       Q.    But it's your testimony that the

19  supervisory personnel should be aware of that

20  form?

21       MR. RUBERRY:  Objection, calls for

22  speculation.

23            Go ahead and answer.

24  BY THE WITNESS:

142

1    A.    I would assume they would know that.

2    BY MS. MALONE:

3    Q.    And would be able to instruct officers

4    under their command that the form exists?

5    MR. RUBERRY:    Same objection.    The question's

6    vague.

7         Go ahead and answer.

8    BY THE WITNESS:

9    A.    The key to the form would be that

10   there's a chain of command.

11   BY MS. MALONE:

12   Q.    A police officer -- how would a police

13   officer become aware the form existed?

14   A.    Again, if they need a request, that's

15   even -- whether it be a day-off request, a sick

16   day, no matter what -- any request whatsoever,

17   there's a chain of command.    They would request it

18   from the -- their senior officer, lieutenant or

19   sergeant, and that's how they would be aware of

20   it.

21   Q.    And if their sergeant was not aware of

22   the existence of the form, how would you explain

23   that?

24   A.    I can't.

143

1     Q.    Now, earlier, you told us that -- it

2  was your testimony that Officer Scandora requested

3  to return to light duty.

4         Do you recall that testimony?

5     A.    No.  Refresh me further.

6     Q.    Okay.  After the accident, did you have

7  a conversation with Officer Scandora regarding her

8  duty status?

9     A.    I don't know if we had a conversation.

10  She presented me with a document saying that she

11  could work light duty.

12     Q.    And do you recall having a conversation

13  with her before she presented you with that

14  document?

15     A.    No, not at this time.

16     Q.    Do you recall instructing her that she

17  was on thin ice and needed to return to work?

18     A.    Never said it.

19     Q.    Do you recall calling her in to see you

20  after her accident?

21     A.    No.

22     Q.    Do you recall the date of her return to

23  duty?

24     A.    No.

144

```
 1          MS. MALONE:  Mark that as 21.
 2                       (WHEREUPON, a certain document
 3                       was marked Scavo Deposition
 4                       Exhibit No. 21, for
 5                       identification, as of 7/19/06.)
 6     BY MS. MALONE:
 7          Q.   Showing you what we've marked as
 8     Deposition Exhibit No. 21, is that the document
 9     that Officer Scandora brought you regarding her
10     return to duty?
11          A.   Yes.
12          Q.   And that indicates that she was to
13     return to work as of December the 2nd?
14          A.   Yes.
15          Q.   And did you have any conversation with
16     Officer Scandora concerning this document on the
17     day she presented it?
18          A.   I can't recall at this time.
19          Q.   Is there anything you could think of
20     that would refresh your memory?
21          A.   No.
22          Q.   Did you keep any notes of the
23     conversation?
24          A.   I don't know if I had a conversation.
```

146

1      A.     No.

2      Q.     Did you --

3      A.     I don't recall that.

4      Q.     You don't -- do you -- do you know

5   where she was assigned when she returned?

6      A.     No.

7      Q.     Did you ever ask her supervisors where

8   they were assigning her?

9      A.     No.

10     Q.     Do you recall any conversation with

11  Officer Scandora in October or November of 2003

12  regarding Sergeant DiMaio?

13     A.     No.

14     Q.     Do you recall meeting with

15  Officer Scandora in October or November of 2003

16  regarding Officer DiMaio?

17     A.     No.

18     Q.     After December the 2nd of 2003, do you

19  recall the next occasion when you had any

20  discussion with anyone concerning

21  Officer Scandora?

22     A.     No.

23     MS. MALONE:  Mark this as 22.

24              (WHEREUPON, a certain document

147

```
1                    was marked Scavo Deposition
2                    Exhibit No. 22, for
3                    identification, as of 7/19/06.)
4    BY MS. MALONE:
5        Q.   I'm showing you what was marked as
6    Deposition Exhibit No. 22.
7             Do you recognize that document?
8        A.   Yes.
9        Q.   When did you first become aware of this
10   document?
11       A.   According to this, December 3rd.
12       Q.   Does that comport with your
13   recollection?
14       A.   I have no recollection, except this
15   document.
16       Q.   Did you have any discussions with
17   Sergeant DiMaio about this document?
18       A.   I don't recall at this time.
19       Q.   Can you think of anything that would
20   refresh your recollection?
21       A.   The only thing is is this letter.
22       Q.   Did you talk to Officer Scandora
23   concerning this incident?
24       A.   What incident?
```

148

1    Q.    The incident referenced in this letter.

2    A.    I would -- I totally don't recall, but

3  if this letter was presented to me, I would have

4  had a conversation.

5    Q.    And would you have called her into your

6  office?

7    A.    Yes.

8    Q.    Do you keep any records of meetings

9  that you hold in your office?

10   A.    No, other than this is a record

11  (indicating).

12   Q.    There's no appointment book or calendar

13  or anything of that kind?

14   A.    No.

15   Q.    Do you have any recollection as to the

16  date you met Officer Scandora concerning this?

17   A.    Again, referring to this letter, it

18  would -- I would assume December 3rd.

19   Q.    Do you recall who, if anyone else, was

20  present?

21   A.    No.

22   Q.    Was anyone else present?

23   A.    I don't recall.

24   Q.    Now, is this letter something in the

149

1    nature of a warning or a reprimand, or what is

2    this?

3         A.    This is a letter of information stating

4    that, once again, she had broke a general order

5    and advising her what was discovered after she was

6    questioned, whether or not she did try to contact

7    Arrellano about the audiotapes.  That's what's in

8    the body of this letter, so that's what I'm going

9    with.

10        Q.    And you don't recall what

11   Officer Scandora told you about this when you met

12   with her?

13        A.    She denied it, according to this

14   letter.

15        MR. RUBERRY:  So then your answer is you do

16   recall?

17        THE WITNESS:  Yes.

18   BY MS. MALONE:

19        Q.    So you do recall meeting with

20   Officer Scandora?

21        A.    No.  I recall that -- could you go

22   back?  I'm kind of getting mixed up here.

23        Q.    I'm sorry.  You don't recall your

24   meeting with Officer Scandora, but you're just

150

```
 1   going by what's written in the letter; is that
 2   right?
 3        MR. RUBERRY:  Objection, that is not his
 4   testimony.
 5             Counsel, you ask him a "when" question,
 6   and he doesn't exactly remember.  I mean, I think
 7   you're confusing the witness and the record here.
 8   BY MS. MALONE:
 9        Q.   Okay.  I'm -- please, Chief, correct
10   me.  What do you recall?
11        A.    I'm not recalling anything other than,
12   if I was presented this letter on December 3rd, I
13   would call her in stating -- in telling her that
14   this letter has been presented to me.
15             After you've already been told --
16   obviously there's a prior letter issued to her,
17   according to this (indicating) -- and you had --
18   and Lieutenant DiMaio -- or Sergeant DiMaio at the
19   time -- has written me this letter notifying me
20   that you had -- the general order, once again, was
21   violated, and that you denied ever speaking to
22   Arrellano; but after the sergeant investigated it,
23   he discovered, not only did you speak to
24   Arrellano, you spoke to Williams and to Caputo,
```

151

```
 1    and I'm only recalling that because I'm reading
 2    what is in this letter.
 3        Q.    Okay.  Do you recall, reading this
 4    letter, what Officer Scandora's response was?
 5        A.    I recall that she still stuck to her
 6    guns of denial that she never spoke to these
 7    people.
 8        Q.    And this was in the meeting with you?
 9        A.    When I presented the letter.
10        Q.    Do you recall anything else she said?
11        A.    No.
12        Q.    Do you know how Sergeant DiMaio became
13    aware of Officer Scandora's conversation with
14    Officer Rinella?
15        A.    I would assume with the conversation
16    that I had with Rinella that he just approached
17    Sergeant DiMaio and told her -- told him whether
18    or not he should give these photographs to her.
19        Q.    Did Officer Rinella talk to
20    Sergeant DiMaio before he talked to you or after?
21        A.    I -- I don't have -- I don't have no
22    idea about that.  That's their conversation.
23        Q.    Under the chain of command, shouldn't
24    Officer Rinella have spoken to either his own
```

152

```
 1   supervisor or Sergeant DiMaio prior to coming to
 2   you?
 3        A.   Well, he's a -- he was --
 4        MR. RUBERRY:  I'm going to object to the form
 5   of the question.  This is so vague.
 6   BY MS. MALONE:
 7        Q.   I'm -- can you answer, Chief?
 8        A.   Well, as far as chain of command, he
 9   did.  He followed chain of command because DiMaio
10   is the sergeant; he's the blue shirt.
11        Q.   So he would have talked to
12   Sergeant DiMaio first before coming to you?
13        A.   I don't know.
14        Q.   But that would have been the chain of
15   command?
16        A.   That's the chain of command.  Now,
17   whether or not he followed that, I don't know.
18        Q.   Did you ask him?
19        A.   No.
20        Q.   Is following the chain of command
21   important to you?
22        MR. RUBERRY:  Objection, asked and answered.
23             Go ahead and answer.
24   BY THE WITNESS:
```

153

```
 1      A.    What would you think?  Seriously.  I

 2  mean, we're getting a little ridiculous here.

 3  What would you think?  I'm the police chief.  Do

 4  you think they should be following chain of

 5  command?

 6           I make an SOP.  I predict the laws and

 7  the route regulations.  Of course I would think

 8  that's very important.

 9  BY MS. MALONE:

10      Q.    So it would have been important for

11  Officer Rinella to have followed the chain of

12  command?

13      MR. RUBERRY:  When and where, Counsel?  This

14  is really -- we're getting into a metaphysical

15  discussion here.  Come on.

16  BY MS. MALONE:

17      Q.    Sir?

18      MR. RUBERRY:  Answer the question, if you

19  can.

20  BY THE WITNESS:

21      A.    I don't know whether or not he did or

22  he didn't.  He might have.  That's their

23  conversation.  Not mine.

24  BY MS. MALONE:
```

154

```
 1        Q.    When you talked to Sergeant DiMaio and
 2    Sergeant Sarni about this incident, did you ask
 3    them if they were aware of it before you spoke to
 4    them?
 5        A.    Aware of what?
 6        Q.    Aware of this request.
 7        MR. RUBERRY:  What request?
 8    BY MS. MALONE:
 9        Q.    The request for information from
10    Officer Scandora to Officer Rinella.
11        A.    I'm -- I'm -- you know what, I'm
12    getting confused.  I don't know what you're
13    trying -- trying to get out of me.
14        Q.    I'm just trying --
15        A.    If you're -- if --
16        THE WITNESS:  You want me to talk, Pat?
17        MR. RUBERRY:  No.  Just -- don't -- don't
18    volunteer anything at this point.  I mean, the
19    question is hopelessly unclear.
20              You're talking about two different --
21    three different things in a single question.
22        MS. MALONE:  I'm sorry.  The --
23        MR. RUBERRY:  Reask the question.
24    BY MS. MALONE:
```

155

```
 1      Q.    When you say that the chain of command
 2   is important to you, that's true for
 3   Officer Rinella, as well as any other officer; is
 4   that correct?
 5      A.    Yes.
 6      Q.    And prior to coming to you, an officer
 7   ought to follow the chain of command and speak to
 8   their supervisors or another sergeant; is that
 9   right?
10      MR. RUBERRY:  Objection, to the extent -- the
11   question is a vague, incomplete hypothetical.
12           If you understand it, go ahead.
13   BY THE WITNESS:
14      A.    I don't.
15      MR. RUBERRY:  In what circumstances?
16   BY MS. MALONE:
17      Q.    Yeah, I guess I don't understand, sir,
18   because earlier you told us that you have an
19   open-door policy; is that correct?
20      A.    Yes.
21      Q.    And that police officers could come and
22   ask you questions or ask for information; is that
23   correct?
24      A.    Absolutely.
```

160

1    above him.  He has no immediate supervisor because

2    he's a specialist.  So anybody up and above a

3    patrolman is his immediate supervisor -- sergeant,

4    lieutenant, deputy chief or chief, myself.  That's

5    his chain of command.

6    BY MS. MALONE:

7        Q.   So I'm -- I'm -- I think I'm clear, the

8    chain of command is a hierarchical; it goes

9    patrol, the sergeant, lieutenants, deputy chiefs,

10    chiefs, right?

11        A.   Correct.

12        Q.   So the chain of command really doesn't

13    have anything to do with discussions between

14    patrol officers?

15        MR. RUBERRY:  Object to the form of the

16    question.  It's vague.  If you understand it, go

17    ahead and answer.

18        THE WITNESS:  I don't understand it.

19    BY MS. MALONE:

20        Q.   Okay.  Chain of command, the concept,

21    has no bearing upon a discussion that one patrol

22    officer might have with another patrol officer,

23    does it?

24        A.   I'm confused.

161

1     Q.    Okay.

2     A.    I totally don't -- can't -- I don't

3  understand how you don't understand.

4              What is the conversation between two

5  patrolman who are no higher, other than seniority,

6  on an annual -- or a yearly -- or in -- what's the

7  word I'm looking for? -- hiring date.

8              In other words, if I'm hired in

9  December of 2003, he's hired in December 2004, I'm

10 his senior, but that's got nothing to do with

11 chain of command.

12    Q.    Right.  Right.  Whatever you guys might

13 talk about is one officer to another; it's got

14 nothing to do with the chain of command, right?

15    MR. RUBERRY:  Objection as to the form of the

16 question.  It is hopelessly vague.

17 BY THE WITNESS:

18    A.    I can't answer it because I -- I

19 don't -- I don't -- I really don't know what you

20 want me to say.

21 BY MS. MALONE:

22    Q.    I'm just trying to make sure we're all

23 clear.  There's --

24    A.    We're clear.

162

```
 1      Q.    All right.  Right.  That it's a
 2   hierarchical concept, right?
 3      A.    Right.
 4      Q.    And, earlier, you had told us that -- I
 5   asked you whether police officers, from time to
 6   time, ask their fellow officers questions
 7   concerning policies and procedures, and you had
 8   indicated you really have no idea whether they do
 9   or they don't.
10            Is that still true?
11      A.    Correct.
12      Q.    Now, you told us before that you became
13   the chief of police in Melrose Park in 1996?
14      A.    Correct.
15      Q.    But you had been with the village
16   police department for approximately 30 years, I
17   believe?
18      A.    Yes.
19      Q.    Did you then come up through the
20   ranks -- served as a patrol officer, sergeant,
21   lieutenant?
22      A.    Correct.
23      Q.    And when you were a sergeant, did you,
24   from time to time, have discussions with other
```

163

```
 1    sergeants about what the policies and procedures
 2    of the department were?
 3         MR. RUBERRY:  Objection, relevance.
 4              Go ahead and answer.
 5    BY THE WITNESS:
 6         A.    I don't recall if I ever did or not.
 7    BY MS. MALONE:
 8         Q.    When you were a lieutenant, did you
 9    have a discussion with your fellow lieutenants
10    about what the village's policies and procedures
11    were?
12         MR. RUBERRY:  Same objection.
13              Go ahead and answer.
14    BY THE WITNESS:
15         A.    I don't recall.
16    BY MS. MALONE:
17         Q.    Did there come a point in time when you
18    had a conversation with an individual named Chris
19    Corter?
20         A.    I've had several conversations with
21    Chris Corter.  I don't know where you --
22         Q.    Regarding Officer Scandora?
23         A.    At this time, I'm not -- I'm not sure
24    if I did.
```

164

1     Q.    Did you -- do you recall calling

2  Mr. Corter into your office and asking him about

3  Officer Scandora?

4     A.    I don't recall if I did or didn't.  I

5  do recall that he was involved in an incident

6  where she asked him to assist her.

7     Q.    And how did you become aware of this

8  incident?

9     A.    I don't recall.

10     Q.    What was the nature of the assistance

11  Officer Scandora was requesting?

12     A.    I don't recall.

13     Q.    Chief, directing your attention back to

14  Exhibit 20, this schedule would indicate that

15  Sergeant DiMaio was off work from December the 4th

16  through December the 8th?

17     A.    Yes.

18     Q.    During the period from December the 4th

19  to December the 8th, do you recall anyone bringing

20  any claimed misconduct on the part of

21  Officer Scandora to your attention?

22     A.    I don't recall.

23     Q.    This schedule also indicates that

24  Sergeant DiMaio returned to work on December the

165

1   9th.

2        Do you see that?

3   A.   Yes.

4   Q.   This incident where Officer Scandora

5  allegedly asked for assistance of some type, do

6  you know if that supposedly occurred on September

7  the 9th -- or December the 9th?

8   A.   I don't -- I don't -- I don't

9  understand the question.  Assistance?

10    Q.   Well, you had said that you -- someone

11  brought to your attention an incident where

12  Officer Scandora allegedly requested Chris

13  Corter's assistance?

14    A.   I didn't say that.

15    Q.   I'm sorry.  What did -- what was your

16  understanding?

17    A.   I said that I recall an incident.  I

18  didn't say who said it, how I found out about it.

19  I don't recall.  But I do know that she was

20  involved with something on a request of Corter.

21    MS. MALONE:  Mark that as 23.

22           (WHEREUPON, a certain document

23           was marked Scavo Deposition

24           Exhibit No. 23, for

166

```
1                    identification, as of 7/19/06.)
2   BY MS. MALONE:
3        Q.   Chief Scavo, showing you what we've
4   marked as Deposition Exhibit No. 23, before the
5   first session of your deposition, you had
6   indicated you have reviewed some write-ups, I
7   believe.
8             Is this one of the documents you
9   reviewed?
10       A.   I don't know.
11       Q.   Do you recognize this document?
12       A.   I signed it, but I don't recognize it
13  at this time, but I -- I must have had it in my
14  possession.
15       Q.   Do you recall any discussion with
16  Sergeant DiMaio concerning this incident?
17       A.   I want to -- could I read it?
18       Q.   Certainly.  I'm sorry.
19       A.   Okay.  Now, what was the question?
20       Q.   Do you recall this -- this document?
21       A.   Yes.
22       Q.   When did you get it?
23       A.   According to this, December 9th.
24       Q.   Did you have any discussion with
```

167

```
 1    Sergeant DiMaio concerning this document?
 2        A.    I don't recall.
 3        Q.    I mean, concerning the incident --
 4    apart from the document.
 5        A.    I don't recall.
 6        Q.    Do you recall any discussion with
 7    Chris Corter concerning this --
 8        A.    The only thing I recall is this
 9    letter -- reading it here.
10        Q.    Did you have any discussion or meeting
11    with Officer Scandora concerning this?
12        A.    If she received this letter and I
13    signed it, I would have called her in and handed
14    it over to her and explained it to her.
15        Q.    Do you have any recollection of doing
16    that?
17        MR. RUBERRY:   Objection.   Yet, he's answered
18    the question.
19              Answer it again.
20    BY THE WITNESS:
21        A.    If she received this letter -- I mean,
22    if I received this letter, I would make her aware
23    of the fact that this letter was issued to me, and
24    I would make her aware of what's in the context.
```

168

```
 1    BY MS. MALONE:
 2         Q.    Do you have any recollection of your
 3    conversation with Officer Scandora?
 4         A.    No.
 5         Q.    Do you recall the date of any such
 6    conversation?
 7         A.    The only thing I would go by would be
 8    the date of the letter that's issued to me by
 9    DiMaio.
10         Q.    Did you have any discussion with anyone
11    else concerning this incident?
12         A.    No.
13         Q.    Now, is this a letter to be regarded as
14    a letter of information?  A warning?  A reprimand?
15    What are we to regard this?
16         A.    Reprimand.
17         MS. MALONE:  Mark this as 24, please.
18                    (WHEREUPON, a certain document
19                     was marked Scavo Deposition
20                     Exhibit No. 24, for
21                     identification, as of 7/19/06.)
22    BY MS. MALONE:
23         Q.    Showing you what we've marked as
24    Deposition Exhibit No. 24, do you recognize this
```

176

1   issued for damage to village property, correct.

2   BY MS. MALONE:

3        Q.    And then someone -- I take it, sir,

4   that you're -- you're not involved with any

5   efforts the village may or may not have with

6   seeking reimbursement from the individuals?

7        A.    No.

8        Q.    Do you know who is in the village?

9        MR. RUBERRY:  Objection, relevance, calls for

10  speculation.

11            Go ahead and answer.

12  BY THE WITNESS:

13       A.    No.

14  BY MS. MALONE:

15       Q.    After Officer Scandora's placement on

16  medical leave and prior to Christmas of 2003, did

17  you have any discussions with anybody concerning

18  Officer Scandora?

19       A.    I don't recall.

20       Q.    Can you think of anything that would

21  refresh your recollection?

22       A.    Document.

23       Q.    Did you have any discussion with

24  Ms. Saleme, the --

182

```
 1    would check the lockup periodically during their
 2    shift?
 3         A.    If he's at -- if he's at work, the
 4    station supervisor, he'd take on that
 5    responsibility.
 6         Q.    So he would be primary, and the shift
 7    supervisor would be secondary?
 8         MR. RUBERRY:  Object to the form of the
 9    question.  It's vague.  It's also irrelevant.
10    BY THE WITNESS:
11         A.    Like I --
12         THE WITNESS:  I'm sorry?
13         MR. RUBERRY:  Go ahead and answer.
14    BY THE WITNESS:
15         A.    Like I said, they would share their
16    responsibility, but his actual responsibility,
17    like inventory sheet, prisoner paperwork, that
18    is -- definitely falls underneath job description
19    of the station supervisor, if he's working.
20    BY MS. MALONE:
21         Q.    Did you have any discussion with
22    Lieutenant Potamianos, Sergeant DiMaio or
23    Sergeant Sarni concerning Officer Scandora, that
24    you could recall, between the time of her return
```

183

1   to duty and the time she returned to medical

2   leave?

3       A.    After -- I would -- yes.  When I

4   received those letters, I would -- I would think

5   that I had conversation after I read them to speak

6   to whomever handed them to me.  I would assume it

7   would be DiMaio and/or Sarni, both or

8   individually.  DiMaio would definitely hand them

9   to me, so I would assume there would be a

10   conversation of a content.

11       Q.    On the --

12       A.    Now, do I recall specifics?  Do I

13   recall -- I don't ever recall speaking to

14   Potamianos about it.  I don't even recall speaking

15   to Sarni about it, but it doesn't mean that they

16   weren't present in the -- in the room after I

17   would receive one of these letters.

18       Q.    And other than what you have told us

19   before, do you have any recollection of the

20   content of your conversation with any of these

21   gentlemen?

22       MR. RUBERRY:  I'm going to object to the form

23   of the question.

24           Which gentlemen, Counsel?

184

```
1        MS. MALONE:  Fine.
2    BY MS. MALONE:
3        Q.    Do you have any recollection of the
4    content of your conversation with Sergeant DiMaio,
5    other than what you've previously testified?
6        MR. RUBERRY:  At what point, Counsel?
7        MS. MALONE:  At any point.
8        MR. RUBERRY:  "Any point" goes back from the
9    creation of the universe to the exact instant that
10   we're sitting here.  So that -- ask a question
11   that has something to do with this lawsuit, will
12   you?  This is getting to be a form of torture.
13          Do you understand the question?
14          You're asking -- you're asking these
15   wide-open questions.  I'm not going to let him
16   answer them, and if it continues, I'm going to ask
17   for a protective order.
18       THE WITNESS:  I don't understand the
19   question.
20   BY MS. MALONE:
21       Q.    All right, sir.
22          Do you recall any discussion in
23   December 2003 with Sergeant DiMaio concerning
24   Officer Scandora, other than what you've
```

185

```
 1    previously testified?

 2         A.    The only conversation that I could be

 3    honest is that I would have discussions on any of

 4    the letters I received -- period.

 5         Q.    And after the receipt of the

 6    December 9th letter, do you recall anything that

 7    you said to Sergeant DiMaio or anything he said to

 8    you?

 9         A.    December 9th?

10         Q.    Right.

11         A.    Which one -- which --

12         Q.    That's the -- that would be Exhibit 23.

13         A.    About Corter?

14         Q.    Right.

15         A.    Do I recall --

16         Q.    Anything Sergeant DiMaio said to you or

17    you said to him?

18         A.    No.

19         Q.    And the same thing with regard, do you

20    recall whether you did have any conversations with

21    Sergeant Sarni or Potamianos concerning this?

22         MR. RUBERRY:  What is "this"?

23         MS. MALONE:  Same exhibit, 23.

24         MR. RUBERRY:  Go ahead and answer, if you
```

202

1          And, second of all, you never served us

2     with that subpoena.  Waving something in someone's

3     face, that's not proper service.  If it is, show

4     me where it says that in the rule, Counsel.  You

5     got caught pulling a fast one, so don't glower at

6     me.  You know it.

7          MS. MALONE:  Mr. Ruberry, that's just

8     nonsense and you know it.

9          MR. RUBERRY:  It's the absolute truth.

10          MS. MALONE:  I think you've had some problems

11     with communication within your office.

12          MR. RUBERRY:  No.  The record would object to

13     any inquiry about so-called anger management,

14     Counsel.  It has nothing to do with this lawsuit.

15     BY MS. MALONE:

16          Q.   Chief, at your counsel's request, I've

17     handed you what was provided to us as

18     Sergeant DiMaio's personnel file from the village,

19     and your counsel has gone through it and can

20     correct me if I'm wrong, but there is nothing in

21     that file that would tell us the reasons

22     Sergeant DiMaio was referred to perspectives.

23          Can you think of any reason, sir, why

24     that would not be in the file?

203

```
 1      MR. RUBERRY:  Objection, calls for

 2   speculation, relevance.

 3          If you could answer it, go ahead.

 4   BY THE WITNESS:

 5      A.    Yes.

 6   BY MS. MALONE:

 7      Q.    And what would that reason be?

 8      A.    We had a federal search warrant served

 9   on us on September 8th.  They took all personnel

10   records, which would be all of the originals.

11          At this time -- well, possibly maybe

12   four -- three months ago, I received my files

13   back, and there are several documents missing from

14   several files -- from photographs to birth

15   certificates to initial starting date forms to

16   receiving of certain documents like radios.

17          I have gone back and forth with the

18   federal government over these files.  So -- now,

19   could it be possible that the -- the letters or

20   something is missing from DiMaio's office -- file?

21   Absolutely.  Absolutely.

22          Just by going by how I checked other

23   personnel files, in particular for photographs was

24   one, and like I stated earlier, other documents
```

204

```
 1   that I checked for that I know were in there that

 2   are no longer there for me.  Not only in DiMaio's

 3   but several officers.

 4       Q.    So it's your belief that those

 5   documents would have been in the file when the FBI

 6   ceased them, but they weren't there when they

 7   returned them?

 8       MR. RUBERRY:  Objection, speculation.

 9           Go ahead and answer.

10   BY THE WITNESS:

11       A.    No, I didn't say that.

12   BY MS. MALONE:

13       Q.    But that's the only reason you could

14   think of why that document would be missing?

15       MR. RUBERRY:  Again, it assumes -- it assumes

16   that those documents do, in fact, exist.

17           Go ahead and answer.

18   BY THE WITNESS:

19       A.    No, I didn't say that.

20   BY MS. MALONE:

21       Q.    Can you think of any other reason why

22   it wouldn't be in his file?

23       MR. RUBERRY:  Same objection, speculation.

24           Go ahead and answer.
```

205

```
 1   BY THE WITNESS:

 2        A.    No.

 3   BY MS. MALONE:

 4        Q.    Were you ever asked to review requests

 5   for documents in this matter?

 6        MR. RUBERRY:  Objection.  To the extent it

 7   calls for -- he's not going to answer that.  That

 8   would obviously call for disclosure of any type of

 9   attorney-client communication.

10   BY MS. MALONE:

11        Q.    Did you ever make a search for

12   documents responsive to a request for production

13   in this matter?

14        MR. RUBERRY:  Go ahead and answer.

15   BY THE WITNESS:

16        A.    Yes.

17   BY MS. MALONE:

18        Q.    And when did you undertake that search?

19        A.    Could --

20        MR. RUBERRY:  At what points in time, is what

21   she's asking.

22   BY THE WITNESS:

23        A.    At what point in time?  I -- I -- I

24   don't know.  I mean, it's been based since this
```

209

```
 1    BY MS. MALONE:

 2         Q.    Did you have a meeting with Lisa

 3    Scandora on or about December the 22nd or 23rd of

 4    2003?

 5         A.    I'm not exact on the date, but I had a

 6    meeting somewhere around there, yes.

 7         Q.    And who called for that meeting?

 8         A.    I would have.

 9         Q.    And what was the purpose of that

10    meeting?

11         A.    If you're referring to the termination,

12    that was for a termination.

13         Q.    When did you decide that you were going

14    to terminate Officer Scandora?

15         A.    Exact date and time?  No idea.  But I

16    do recall having a -- a group meeting with both

17    deputy chiefs, her immediate supervisors and

18    myself, going over the documentation, going over

19    the incidents.  Due -- and going over her monthly

20    reports.

21              And due to her probationary situation,

22    that she was a probationary officer, then I came

23    to that conclusion after getting opinion of all of

24    the above.
```

223

```
1        MR. RUBERRY:  Which documents do you need to
2    see?
3        THE WITNESS:  Well, there was a -- there was
4    an -- I need all the letters.  Then I could go by
5    that because there's -- there's a reference that
6    this is the third time or -- here, it's -- it's in
7    this letter right here.
8                "When you finished reading the write-up
9    on the 1st and had conversation with reporting
10   officer on the chain of command, you then went to
11   Officer Rinella and asked for copies of the photos
12   of your accident."
13               That's insubordination right there.
14   BY MS. MALONE:
15       Q.    Okay.
16       A.    Also, on the letter from DiMaio on
17   December 9th, this was something she was written
18   up for on December 1st and the 3rd.  So, again,
19   reference to insubordination.
20       Q.    And you regard that as insubordination?
21       MR. RUBERRY:  Asked and answered.
22   BY THE WITNESS:
23       A.    Yes.  After -- after you've been told
24   of not following certain orders or not following
```

224

```
 1   chain of command or not following any regulation
 2   that's an SOP or deemed by your shift commander, I
 3   would -- I would say that's insubordination, yes.
 4   BY MS. MALONE:
 5       Q.    Have you ever suspended any police
 6   officer during your tenure as chief of police for
 7   insubordination?
 8       MR. RUBERRY:  Objection, relevance, also
 9   overly broad, unlimited in time and scope.
10             Go ahead and answer.
11   BY THE WITNESS:
12       A.    I -- I've suspended officers for
13   several things, several officers, and for what
14   reasons, I couldn't be honest and say right now.
15   BY MS. MALONE:
16       Q.    Can you tell me the names of any of
17   those officers?
18       A.    If I can't recall why I would have done
19   it, I -- I couldn't give you names.
20             I could -- I have -- I could tell you
21   this:  I've taken days off -- and I consider this
22   insubordination:  Where people have not called the
23   immediate supervisor for calling in sick.  I've
24   taken days -- I did it this morning.
```

225

```
 1      Q.    Prior to Officer Scandora's
 2   termination, can you identify any officer whom you
 3   could recall suspending or terminating for
 4   insubordination?
 5      MR. RUBERRY:  Object to the scope.  Also,
 6   object to the form of the question.
 7           Go ahead and answer.
 8   BY THE WITNESS:
 9      A.    No.
10   BY MS. MALONE:
11      Q.    Prior to Officer Scandora's
12   termination, can you recall any officer, other
13   than Officer Scandora, whom you've reprimanded or
14   suspended or terminated for violation of the chain
15   of command?
16      MR. RUBERRY:  Object to the form the
17   question.  You've got three questions in there.
18           Go ahead and answer if you can.
19   BY THE WITNESS:
20      A.    I can't recall.
21   BY MS. MALONE:
22      Q.    Prior to Officer Scandora's
23   termination, did you discipline any police officer
24   employed by Melrose Park for disrespect of a
```

226

1    supervisor?

2        MR. RUBERRY:  Objection, relevance, unlimited

3    in time and scope.

4            Go ahead and answer.

5    BY THE WITNESS:

6        A.    That's a difficult question to answer.

7    Like counsel said, the scope of termination, the

8    scope of suspension and the definition of what you

9    think is insubordination or what he thinks or what

10   I think are two different things.

11           Now, just sitting here and trying to go

12   through, I did terminate a -- a man during the

13   12-week academy for insubordination because he

14   refused to adhere to the rules and regulations of

15   the academy.  So there's one guy.

16   BY MS. MALONE:

17       Q.    Is that Mr. Echevarria?

18       A.    Correct.

19       Q.    And that was after Officer Scandora,

20   right?

21       A.    No.

22       Q.    That was before?

23       A.    Now you got me confused.  I -- I'm not

24   certain whether it was before or after.  It could



# MELROSE PARK POLICE DEPARTMENT

**VITO R. SCAVO**
Chief of Police

TO:      SGT. DINO DIMAIO

FROM:      CHIEF VITO R. SCAVO

DATE:      SEPTEMBER 16, 2002

RE:      ASSIGNMENT CHANGE

EFFECTIVE THURSDAY, OCTOBER 10, 2002, YOU WILL
ASSIGNED TO STATION SUPERVISOR ON THE MIDNIGHT SHIFT.

RESPECTFULLY SUBMITTED,

CHIEF VITO R. SCAVO

VRS/jl

1 NORTH BROADWAY • MELROSE PARK • ILLINOIS    EXHIBIT   09
"911" FOR EMERGENCY



January 6, 2003

Deputy Chief Pitassi
Melrose Park Police Dept
Melrose Park, Ill 60160

Dear Deputy Chief Pitassi

Concerning Mr. Dino Dimaio, he has been compliant with his attendance and cooperative in treatment. He has completed 7 sessions for anger management. It is anticipated that we will continue counseling for 3 more sessions should he resume his former duties as a police officer.

Please contact me if I can be of further assistance.

Sincerely,

Ann Bruckelmeyer, LCSW, CADC

CC: Mr. Dimaio



17W733 Butterfield Road, Suite A • Oakbrook Terrace, Illinois 60181-4281
111 N. Wabash Avenue, Suite 1620 • Chicago, Illinois 60602-2002
(630) 932-7788/8008 • 1-800-456-6327
FAX (630) 932-2315 • TDD #(630) 932-2322

,ON • ELGIN • EVERGREEN PARK • HOMEWOOD • HIGHLAND PARK • OAKBROOK TERRACE • JOLIET • MERRILLVILLE

✗2.



# MELROSE PARK POLICE DEPARTMENT



**VITO R. SCAVO**
Chief of Police

| | |
|---|---|
| To: | Chief Vito R. Scavo |
| From: | Lt. Joe Sansone/Sgt. George Zito |
| Subject: | Accident with squad cars (1104 and 1108), Offrs. Negron & Lavalais. |
| Date: | May 22, 2004 (UB#04-10286) |

Dear Chief,

In reference to the accident between our two squad cars, I have completed my investigation. After reviewing the reports, speaking to the officers involved, and witnessing the accident scene, I have determined that Officer Negron was 100% at fault.

Due to the fact that myself and Sgt. Zito constantly remind our officers about the importance of driving safely and staying in their assigned zones, I am recommending and requesting the following disciplinary actions to be taken against Officer Negron; 1) that his five remaining 2004 new days be taken from him, 2) that he be assigned to attend a defensive or pursuit driving class as it becomes available, 3) that his probationary period be extended an additional 90 days.

In regards to Officer Lavalais, although he was not at fault, I request that he also attend a defensive or pursuit driving class as it becomes available.

Respectfully Submitted

Lt. Joe Sansone

Sgt. George Zito

Negron EXHIBIT 2
FOR I.D. 6/21/06 13.0

Scavo 11

**1 NORTH BROADWAY • MELROSE PARK • ILLINOIS 60160 • 708-344-8409**
**"911" FOR EMERGENCY**



# MELROSE PARK POLICE DEPARTMENT

**TO:** OFFICER PHIL NEGRON

**FROM:** CHIEF VITO R. SCAVO

**DATE:** JULY 7, 2004

**VITO R. SCAVO**
Chief of Police

I HAVE BEEN INFORMED DUE TO YOU RECENT ACCIDENTS, IF YOU ARE INVOLVED IN AN ACCIDENT WITHIN THE NEXT 12 MONTHS AND FOUND TO BE NEGLIGENT YOU WILL NOT BE ALLOWED TO DRIVE A SQUAD CAR WITHIN A PERIOD OF 12 MONTHS FROM THAT DATE.

RESPECTFULLY SUBMITTED,

CHIEF VITO R. SCAVO



EXHIBIT
Scavo 14

Negron EXHIBIT 4
FOR I.D. 6/21/06 1-20

**1 NORTH BROADWAY • MELROSE PARK • ILLINOIS 60160 • 708-344-8409**
**"911" FOR EMERGENCY**



# MELROSE PARK POLICE DEPARTMENT

Jan. 3rd, 2005

**VITO R. SCAVO**
Chief of Police

TO: CHIEF SCAVO

FROM: LT. POTAMIANOS

REF: JOB PERFORMANCE OF
OFFICER NEGRON #78

CHIEF SCAVO:
I HAVE GREAT CONCERNS ON THE JOB PERFORMANCE OF OFFICER PHILLIP NEGRON.
DURING MY SHORT TIME THAT I HAVE HAD OFFICER NEGRON UNDER MY COMMAND
I HAVE ENCOUNTERED JOB PERFORMANCE SHORT-COMINGS. ON DEC.25th 2004 OFC.
NEGRON RESPONDED TO "ARACELY's BAKERY" LOCATED AT 144 N. BROADWAY BLOTTER
NUMBER 04-25687. THIS CALL WAS A BUSINESS CHECK OR A PREMISE CHECK. OFFICER
NEGRON WENT OVER THE AIR STATING THE PREMISES APPEARED SECURE. IT WAS WHEN
OFFICER JUAN #66 RESPONDED THAT THE GLASS ON THE ENTRY DOOR WAS OBSERVED AS
BEING BROKEN. THIS WAS THE SAME DOOR THAT OFFICER NEGRON HAD ENTERED. I
SPOKE WITH OFFICER NEGRON ON THIS MATTER THE SAME DAY.
    ON JAN. 1st, 2005 OFFICER NEGRON HANDLED AN ACCIDENT ON THE 2600 W.
NORTH AVE. #00031. ON JAN. 2nd 2005 THE DRIVER OF VEH. #2 CAME INTO THE
STATION WITH CONCERNS ABOUT HER ACCIDENT REPT. THAT THE VEHS DAMAGE WAS
INVERTED. I HAVEN"T HAD OCCASION TO SPEAK WITH OFFICER NEGRON ON THIS
MATTER. THERE HAVE ALSO BEEN OTHER SMALL INCIDENTS THAT I HAVE HAD CONCERNS
WITH THAT OFFICER NEGRON HAS HANDLED.
    ON JAN. 3rd 2005 I SPOKE WITH DEPUTY CHIEF MONTINO ABOUT THIS MATTER
WE BOTH AGREE THAT OFFICER NEGRON LACKS IN HIS ORGANISATIONAL SKILLS, AND
IN RETENTION. I MENTIONED TO DEP. CHIEF MONTINO THAT I WOULD LIKE TO PUT
OFFICER NEGRON BACK WITH A TRAINING OFFICER WHEN MAN POWER ALLOWS. I WOULD
ALSO LIKE TO SEE IF THERE IS A CLASS THAT MAY HELP OFFICER NEGRON TO BE
MORE ORGANIZED AND FOCUSED IN HIS JOB PERFORMANCE. IF THERE IS ANYTHING
YOU CAN DO OR SUGGEST IN THIS MATTER PLEASE FEEL FREE TO CONTACT ME. I
REMAIN:



Negron EXHIBIT 5
FOR I.D. 6/21/06 1 Lo

RESPECTFULLY YOURS:

LT. WILLIAM POTAMIANOS #6

#15

cc; dep chief montino

**1 NORTH BROADWAY • MELROSE PARK • ILLINOIS 60160 • 708-344-8409**

"911" FOR EMERGENCY



August 11, 2003

Ms. Jackie McMillan
Village of Melrose Park
1000 W. 25th Avenue
Melrose Park, Illinois 60160

Dear Ms. McMillan,

I am writing to inform you that I am closing the case I have on Mr. Dino Dimaio who I had seen last September and for a few sessions following. As you know, Mr. Dimaio had been referred to Perspectives for an attitude problem and we met to address this. After speaking with you and learning that resolution has been made, I see no further need to meet with him again. Thank you for the opportunity to serve the Village.

Should you have any further concerns, please contact me.

Sincerely,

Ann Bruckelmeyer, LCSW, CADC
EAP Counselor



EXHIBIT
Scavo 12

VITO R. SCAVO
CHIEF OF POLICE

# MELROSE PARK POLICE DEPARTMENT

| GENERAL ORDER | 02-037-0046 | **LIGHT DUTY POSITIONS** | | | |
|---|---|---|---|---|---|
| | ORDER NUMBER | SUBJECT | | | |
| 05/31/94 | 04/01/96 | | | | A/C |
| DATE ISSUED | AMENDS DATE | RISIND NBR. | RISIND DATE | EXPIRATION DATE | DISTRIBUTION |

PLEASE BE ADVISED THAT LIGHT DUTY POSITIONS NOW HELD BY POLICE PERSONNEL WILL BE ELIMINATED.

ANY CERTIFIED POLICE OFFICER MUST RETURN TO ACTIVE DUTY AS REQUIRED BY THE BOARD OF FIRE AND POLICE COMMISSIONERS AND STATE STATUE.

IF YOU ARE UNABLE TO RETURN TO ACTIVE DUTY PERMANENTLY, YOU SHALL BE REQUIRED TO APPLY FOR YOUR DISABILITY PENSION AS PROVIDED BY YOUR PENSION BYLAWS.

IF YOU HAVE A INJURY OR ILLNESS THAT FOR A TEMPORARY PERIOD OF TIME KEEPS YOU FROM PERFORMING ALL DUTIES REQUIRED ON ACTIVE DUTY, A TEMPORARY LIGHT DUTY ASSIGNMENT MAY BE CONSIDERED BY THE CHIEF OF POLICE.

REVISED AND APPROVED TO BE INSERTED AND MAINTAINED IN THE S.O.P. MANUAL ON 04/01/96 BY ORDER OF

CHIEF OR POLICE VITO R SCAVO

Scavo Ex 18



# MELROSE PARK POLICE DEPARTMENT

**VITO R. SCAVO**
Chief of Police

TO:     OFFICER LISA SCANDORA

FROM:   CHIEF VITO R. SCAVO

DATE:   DECEMBER 22, 2003

REFERENCE:  IMMEDIATE TERMINATION

DEAR OFFICER SCANDORA:

I AM WRITING THIS LETTER NOTIFYING YOU THAT YOU ARE IMMEDIATELY TERMINATED REGARDING YOUR POSITION AS A FULL TIME POLICE OFFICER. AT THIS POINT IN TIME YOU ARE STILL UNDER THE EIGHTEEN MONTH PROBATIONARY PERIOD, WHICH DOES NOT ALLOW YOU ANY RIGHTS TO A POLICE AND FIRE COMMISSION HEARING. YOUR TOTAL DISREGARD OF CHAIN OF COMMAND DEDICATION AND RESPONSIBILITY TO YOUR IMMEDIATE SUPERVISOR HAS INFLUENCED ME TO MAKE THIS DECISION. YOUR RESISTANCE TO NOTIFING THE WHOLE TRUTH WHEN QUESTIONED CONCERNING YOUR REQUESTS OF CERTAIN CONFIDENTIAL MATERIAS ADDED MORE INFLUENCE TO THIS DECISION.

RESPECTFULLY SUBMITTED

CHIEF VITO R. SCAVO

CC: MAYOR RON SERPICO
    POLICE AND FIRE COMMISSION
    IMMEDIATE SUPERVISOR

**1 NORTH BROADWAY • MELROSE PARK • ILLINOIS 60160 • 708-344-84**

27